James R. FITZPATRICK, as Trustee of
A. W. Sikking Co., Bankrupt,
Plaintiff-Appellee,

v.

PHILCO FINANCE CORP., Defendant-
Appellant.

No. 73–1161.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 10, 1974.

Decided Feb. 21, 1974.

Robert C. Walbaum, Richard R. Grummon, Springfield, Ill., for defendant-appellant.

Conrad Noll, Jr., Robert E. Davlin, Springfield, Ill., for plaintiff-appellee.

Before SWYGERT, Chief Judge, KILEY, Senior Circuit Judge, and SPRECHER, Circuit Judge.

SPRECHER, Circuit Judge.

This appeal concerns the right to proceeds from secured collateral following the debtor's bankruptcy.

Prior to 1969, A. W. Sikking Co. was a large and established appliance store in Springfield, Illinois. For some years Sikking had financed its purchase of Philco appliances through an agreement with Philco Finance Corp. Pursuant to that agreement, Philco had properly filed financing statements showing its secured interest in the appliances and in the proceeds of the collateral. As soon as Sikking sold an applicance, it was obligated under the agreement to pay the amount due on that item to Philco.

Philco products were distributed in the Illinois-Iowa area by Hardware Products Co. in Sterling, Illinois. Philco Finance had extended a credit line of $275,000 to Sikking as Hardware Products' largest retail dealer.

Sikking's practice in handling Philco sales was to write up a sales receipt on each appliance sold. The receipt noted the brand and kind of appliance, its model number, total price, cash down payment and financing arrangement. All cash payments were deposited in Sikking's general account at Springfield Marine Bank.[1] Much of the Philco merchandise was financed on retail installment contracts, which were sold to a finance company not affiliated with Philco. Proceeds from these contracts were deposited in the same account.

Sikking then drew checks on its account to pay Philco Finance under the security agreement. It appears that the checks usually noted separate Philco invoice numbers and amounts due for each transaction.

In 1969 several officers and directors of Sikking apparently became aware of mismanagement of the business by its president and general manager, Edward Curry. On July 15 they asked Curry to resign. At the urging of another secured creditor, two vice-presidents, Smith and Reilly, hired an accountant to determine the financial condition of the business.

The accountant, Harold Cox, began work on August 11. Although the books were in bad shape and he could not ascertain or verify the value of certain items, Cox prepared a "tentative" balance sheet which he reviewed with Smith and Reilly on September 3. It showed Sikking's liabilities exceeded its assets by more than $160,000.

Smith arranged for a meeting the next day, September 4. Those attending included Smith, Reilly and Cox; H. R. Bertolet, manager of the Philco Finance office in Rock Falls, Illinois; Peter Wheeler, an officer of Hardware Products Co.; several men from General Electric Credit Corp.; and Robert Saner, an officer of Springfield Marine Bank. Cox distributed copies of the balance sheet and led a discussion of Sikking's financial status. No decision about the future of the business was reached at the meeting.

Less than two weeks later, on September 16, Sikking's officers filed a petition in bankruptcy.

The trustee in bankruptcy filed this action against Philco Finance to recover most of the funds Sikking paid to Philco during the ten-day period before bankruptcy was instituted. The trustee's

---

1. Sikking's only other bank account was a payroll account at the same bank. Funds from the general account were deposited to it to cover payroll checks.

theory was that Philco's security interest in proceeds was limited by Ill.Rev. Stat. ch. 26, § 9–306(4):

> In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest
>
> (a) in identifiable non-cash proceeds;
>
> (b) in identifiable cash proceeds in the form of money which is not commingled with other money or deposited in a bank account prior to the insolvency proceedings;
>
> (c) in identifiable cash proceeds in the form of checks and the like which are not deposited in a bank account prior to the insolvency proceedings; and
>
> (d) in all cash and bank accounts of the debtor, if other cash proceeds have been commingled or deposited in a bank account, but the perfected security interest under this paragraph (d) is
>
> > (i) subject to any right of set-off; and
> >
> > (ii) limited to an amount not greater than the amount of any cash proceeds received by the debtor within 10 days before the institution of the insolvency proceedings and commingled or de-

posited in a bank account prior to the insolvency proceedings less the amount of cash proceeds received by the debtor and paid over to the secured party during the 10 day period.[2]

The trustee showed that between September 8 and 15 nine checks totaling $44,766.84 were charged against the Sikking bank account payable to Philco Finance. He also proved that proceeds from the sales of Philco appliances between September 6 and 15 totaled $4,513.44 ($664.95 cash down payments + $3,848.49 proceeds from retail installment contracts). Since section 9–306(4)(d) limits the security interest in proceeds to "an amount not greater than the amount of any cash proceeds received by the debtor within 10 days of the insolvency proceedings," the trustee asked for the return of $40,253.40, the difference between the payments to Philco and the proceeds from Philco sales after September 5. The trustee claimed the $40,253.40 was a voidable preference under section 60 of the Bankruptcy Act, 11 U.S.C. § 96.

Philco's contention on appeal is simple. Ignoring section 9–306(4)(d), it says there can be no voidable preference because the first element under section 60(a)—"a transfer . . . within four months before the filing"—is miss-

---

2. This is the version of section 9–306(4) of the Uniform Commercial Code that was in effect in Illinois in 1969. The section as amended effective July 1, 1973, is set out below; however, the differences in language would not affect the analysis in this opinion.

> In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest only in the following proceeds:
>
> (a) in identifiable non-cash proceeds and in separate deposit accounts containing only proceeds;
>
> (b) in identifiable cash proceeds in the form of money which is neither commingled with other money nor deposited in a deposit account prior to the insolvency proceedings;

> (c) in identifiable proceeds in the form of checks and the like which are not deposited in a deposit account prior to the insolvency proceedings; and
>
> (d) in all cash and deposit accounts of the debtor, in which proceeds have been commingled with other funds, but the security interest under this paragraph (d) is
>
> > (i) subject to any right of set-off; and
> >
> > (ii) limited to an amount not greater than the amount of any cash proceeds received by the debtor within 10 days before the institution of the insolvency proceedings less the sum of (I) the payments to the secured party on account of cash proceeds received by the debtor during such period and (II) the cash proceeds received by the debtor during such period to which the secured party is entitled under paragraphs (a) through (c) of this subsection (4).

ing. Philco relies on Grain Merchants v. Union Bank & Savings Co., 408 F.2d 209 (7th Cir.), cert. denied, 396 U.S. 827, 90 S.Ct. 75, 24 L.Ed.2d 78 (1969), and similar cases. *Grain Merchants* holds that the transfer of a security interest in after-acquired collateral occurs at the time the financial statement is filed. When filing predates the bankruptcy by four months, the transfer of property such as accounts receivable in a "floating lien" situation does not constitute a voidable preference under the Bankruptcy Act. 408 F.2d at 212–215.

The gap in Philco's reasoning is that the state law which creates the security interest also limits its application to commingled proceeds in the event of insolvency. Under section 9–306(4)(d), Philco does not have a perfected security interest in the cash in Sikking's bank account beyond the amount of cash proceeds Sikking collected after September 5. The financing statement does not cover the overage of $40,253.40, so the transfer of that amount in checks to Philco occurred within the four-month period.

Nor do the two alternative rationales of *Grain Merchants* advance Philco's position. There was no transfer "on account of an antecedent debt" in *Grain Merchants* because the accounts receivable that arose within the four-month period were part of the entity of collateral that was transferred to the secured creditor when the financing statement was filed. 408 F.2d at 215–217. The "entity theory" does not apply here because, by definition of section 9–306(4)(d), the overage is not a part of the collateral originally transferred to Philco.

The "substitution of collateral doctrine" was used in *Grain Merchants* to show that the transfer to the creditor was for a substantially contemporaneous advance and did not deplete the estate. 408 F.2d at 217–218. The arrangement in *Grain Merchants* required the debtor to deposit all collections from its accounts receivable in an account at the creditor bank; the debtor was allowed to withdraw from that account to meet current expenses. During the four-month period preceding bankruptcy, the withdrawals were in line with the proceeds from new accounts receivable. There was always an excess of collateral over the secured debt. Because the relative positions of the creditor and debtor were unaltered, the other creditors were not harmed by the substitution of new collateral for prior released accounts.

■ In a sense, section 9–306(4)(d) is an implementation of the substitution of collateral doctrine. It allows a debtor to pay a secured creditor from commingled funds during the ten days before bankruptcy to the extent that the debtor has received cash proceeds within that period. But the doctrine cannot be extended to benefit a creditor such as Philco which persuades a failing business to remit almost ten times the amount of current proceeds from the secured collateral, to the detriment of other secured creditors who were paid nothing from the bank account in the weeks before bankruptcy. Because of section 9–306(4)(d), proceeds collected before the ten-day period and commingled with other funds are not collateral which may be substituted for other collateral.

We conclude that the theories of *Grain Merchants* do not apply to commingled proceeds beyond the security interest granted in section 9–306(4)(d).

■ Finally, acknowledging section 9–306(4)(d) in its reply brief, Philco argues that the limitation in subsection (ii) to an amount not greater than the amount of *"any* cash proceeds" refers to all receipts from any source deposited in the bank account, rather than to receipts from the sale of Philco collateral. Such an interpretation ignores the definition of "proceeds" and perverts the intent of the legislature in adopting section 9–306. The current definition of "proceeds" in section 9–306(1) states: " 'Proceeds' includes whatever is received upon the sale, exchange, collection or other dispo-

sition of collateral or proceeds."[3] The grant of a security interest in commingled funds under section 9–306(4)(d) is not an expansion of the pre-Code right of a secured creditor to trace proceeds from the disposition of secured collateral into such funds; instead, it is a substitution for and a limitation upon that right. In re Gibson, 6 U.C.C.Rep.Serv. 1193 (W.D.Okl.1969); Girard Trust Corn Exchange Bank v. Warren, 25 Pa. D.&C.2d 395, 1 U.C.C.Rep.Serv. 531 (Pa.Ct. of C.P.1958); Uniform Commercial Code Comment, Ill.Rev.Stat. ch. 26, § 9–306, p. 403. To implement the statutory scheme, "any cash proceeds" in subsection (ii) must mean cash proceeds from the sale of collateral in which the creditor had a security interest.

Since proceeds from the sale of Philco appliances between September 6 and 15 were only $4,513.44, the overage of $40,253.40 is a voidable preference and must be returned to the trustee.[4]

■ Philco next challenges the referee's findings of facts relative to three other elements of a voidable preference. We have reviewed the record and find ample evidence to support the referee's findings on each point.

1. *"Antecedent debt."* Philco argues that the payments it received between September 6 and 15 were for merchandise sold during August and early September and thus were for current accounts. But supposedly Philco was not selling to Sikking on open account; the financing agreement on which Philco relies required payment immediately upon the retail sale of each item. The record contains acknowledgements by witnesses on both sides that Sikking for some months had been selling Philco merchandise "out of trust." The trustee adequately proved that the September 6–15 payments, amounting to ten times the proceeds from sales during the period, were made "on account of an antecedent debt," as required by 11 U.S.C. § 96(a)(1).

2. *"Preferential treatment."* As a secured creditor, Philco was entitled to all the remedies provided by the Illinois Uniform Commercial Code. Instead of insisting on immediate payment or segregation of proceeds, Philco allowed Sikking to commingle proceeds in a general bank account and to fall far behind in its obligations. Philco then looked to the general bank account to satisfy its secured interest. By transferring to Philco commingled proceeds over and above current sales, Sikking gave Philco preferential treatment not accorded several other secured creditors. Philco calls attention to transfers made to two secured creditors during the period, but these were transfers pursuant to remedies available to the secured creditors. The checks to Philco depleted Sikking's only cash resources and enabled Philco to obtain a greater percentage of its debt than other secured creditors who received no payments. 11 U.S.C. § 96 (a)(1).

3. *"Reasonable cause to believe that the debtor is insolvent."* 11 U.S.C. § 96(b) allows the trustee to avoid a preference "if the creditor receiving it . . . or his agent acting with reference thereto has, at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent." Phil-

---

3. The 1973 definition is "a rephrasing of prior text without change of substance." Illinois Code Comment, Ill.Rev.Stat. ch. 26, § 9–306 (1973–74 Supp., p. 96).

4. In view of the extensive speculation about the potential conflict between section 9–306(4)(d) and the Bankruptcy Act, it is somewhat surprising that the trustee did not challenge Philco's right to the $4,513.44 paid from commingled funds. II Gilmore, Security Interests in Personal Property 1337–44 (1965); Henson, " 'Proceeds' under the Uniform Commercial Code," 65 Columbia Law Review 232 (1965); 4A Collier on Bankruptcy 708–10 (14th ed. 1971); Gillombardo, "The Treatment of Uniform Commercial Code Proceeds in Bankruptcy: A Proposed Redraft of Section 9–306," 38 University of Cincinnati Law Review 1 (1969).

Since the trustee did not raise this intriguing issue here or below, we cannot consider it.

co's remarkable argument is that· H. R. Bertolet, manager of its Illinois-Iowa office in Rock Falls, Illinois, was not its "agent." Cases interpreting this section hold that virtually any employee of Philco would be its "agent" if he were dealing with Sikking. 3 Collier on Bankruptcy 1084–87 (14th ed. 1971). Philco emphasizes the limitations on Bertolet's authority by the home office in Philadelphia. But the fact remains that Bertolet was Philco's man on the scene. He was the only one in the Philco organization who was in a position to notice changes in a dealer's record of payments and to investigate its financial status. Bertolet had suspended financing because of Sikking's delinquency for a short time in May of 1969. He read credit reports on Sikking. He traveled to Springfield occasionally to check Sikking's inventory of Philco appliances.

As Philco's agent, Bertolet had substantial cause to believe that Sikking was insolvent in September 1969. Besides the storm warnings of the May suspension and unfavorable Dun and Bradstreet reports, Bertolet attended the September 4 meeting and saw the accountant's tentative balance sheet which showed $160,000 more liabilities than assets. Others attending the meeting concluded from the accountant's presentation that Sikking was insolvent and would have to declare bankruptcy. Bertolet's actions following the meeting are further evidence of his knowledge of Sikking's insolvency. On September 10–12 he came to Springfield to take inventory at Sikking. On the 12th, he asked a Sikking vice president for a check for more than $30,000 for "missing" appliances and took the unusual step of having the check certified. The record sufficiently documents the referee's finding that Philco Finance through Bertolet had reasonable cause to believe Sikking was insolvent.

■ Philco advances as error on the referee's part his ruling that the trustee could call H. R. Bertolet as an adverse witness under Rule 43, Fed.R.Civ.P., or as a witness whose interest is adverse under 11 U.S.C. § 44(j). Either procedure was correct, since Bertolet could be considered a managing agent under the more stringent Rule 43. Pietrucha v. Grant Hospital, 447 F.2d 1029 (7th Cir. 1971); Rea v. Ford Motor Co., 355 F. Supp. 842, 882 (W.D.Pa.1972).

Philco also argues that the trustee should have subpoenaed Bertolet, who had been sitting at the counsel table with Philco's attorney for the four days of trial before he was called. Philco did not object to Bertolet's testifying on the grounds he had not been subpoenaed; its only objection was that he was not an adverse witness. If Philco had raised the subpoena objection at the time, the trustee could have obtained a subpoena from the clerk of the court and served it on Bertolet in the courtroom. The necessity for this procedure is doubtful, however, since the implication of Rule 43 and 11 U.S.C. § 44(j) is that an adverse witness who is present in the courtroom may be called to testify without subpoena.

■ A final issue raised by Philco is the time of transfer of three checks dated September 2, received and deposited by Philco in Rock Falls on September 4, and paid by Springfield Marine Bank from Sikking's account on September 8. This question has never been decided for a check that is not post-dated, that has funds to cover it, and that is deposited and paid in the regular course of business. The better view seems to be that payment of the check by the drawee, rather .than the sending or receipt of the check, constitutes the transfer under the Bankruptcy Act. 3 Collier on Bankruptcy 820–23 (14th ed. 1971). Therefore the $5,206.30 represented by the three checks was paid to Philco within the ten-day period and must be deducted from the amount to which Philco is entitled under section 9–306(4)(d)(ii).

The judgment of the referee and the district court is affirmed.

Affirmed.