**In re CHARTER FIRST MORTGAGE, INC., Debtor-in-possession.**

**CHARTER FIRST MORTGAGE, INC., Plaintiff,**

**v.**

**The OREGON BANK, a national banking association, and William E. Brock, Defendants.**

**Bankruptcy No. 683–07420.**
**Adv. No. 683–6195.**

United States Bankruptcy Court, D. Oregon.

Nov. 27, 1985.

See also 42 B.R. 380.

William R. Turnbow and Michael C. Arola, Hershner, Hunter, Miller, Moulton & Andrews, Eugene, Or., for plaintiff.

Don H. Marmaduke, Tonkon, Torp, Galen, Marmaduke & Booth, Portland, Or., for defendants.

## MEMORANDUM OPINION

POLLY S. WILHARDT, Bankruptcy Judge.

The plaintiff, Charter First Mortgage, Inc. (hereinafter CFM), having filed its chapter 11 proceeding on April 20, 1983, brought this action seeking a declaration of rights in certain of its deposit accounts, and an order requiring the defendants The Oregon Bank (hereinafter TOB) and William E. Brock to turn over to it all accounts wrongfully held. In addition, it has requested the court order TOB to pay interest on all deposit accounts in its possession which the court finds were wrongfully withheld. William E. Brock is in default and did not appear at trial.

The facts are quite complex due both to the nature of the debtor-in-possession's business and the myriad business transactions which were effected during the relevant time period. The following are facts to which the parties have stipulated:

1. Prior to the entry of the order for relief in this proceeding, plaintiff was engaged in various business activities, including the following:

a. Originating loans and reselling them to institutional investors. Most loans were either construction loans or loans made to finance the purchase of personal residences.

b. Servicing loans owned by others.

c. Holding and servicing loans owned by plaintiff.

2. Plaintiff was authorized to and did conduct business in the states of Oregon, Washington, Montana and Idaho. Plaintiff operated branch offices in the cities of Puyallup and Everett, Washington, Boise, Idaho and Missoula, Montana.

3. During the one-year period prior to entry of the order for relief in this proceeding, plaintiff serviced loans for various investors, including the Montana Board of Housing, the State of Oregon Housing Division and the Federal National Mortgage Association (FNMA).

4. When servicing loans, plaintiff performed the following activities:

a. Collected periodic principal and interest payments made by individual borrowers and remitted those payments to the owners of the obligations. Plaintiff retained a portion of the payments as a "servicing fee."

b. Collected payments made by individual borrowers for real estate taxes, hazard insurance premiums and mortgage insurance premiums, held those funds in deposit accounts, and paid the individual borrowers' real estate taxes, hazard insurance premiums and mortgage insurance premiums at the proper times.

c. Performed other related administrative functions.

5. When originating loans, plaintiff received deposits known as "application fees" from each individual borrower. These deposits were used to pay expenses of credit reports and real property appraisals. The portions of each "application fee" remaining after payment of such expenses were typically refunded to the applicant or credited to the applicant's account at the time each loan was closed.

6. Plaintiff obtained funds to make most of the loans it originated by borrowing from various institutions, including TOB. Among other loans, TOB provided financing for 101 growing equity mortgage loans (GEM loans).

7. When originating non-construction loans, plaintiff normally followed the following basic procedures:

a. Plaintiff obtained advance commitments from an institutional investor to purchase loans.

b. Upon receipt of an application, plaintiff obtained a credit report, an appraisal and other information necessary to evaluate the proposed loan.

c. Upon its approval of the loan, plaintiff prepared documents for the loan transaction, including a promissory note payable to plaintiff (the Individual Borrower's Note) and a trust deed or mortgage to be executed by the individual borrower.

d. Plaintiff also prepared certain standardized documents for its financing of funds to make the loans. Included among those documents were a promissory note made by plaintiff and payable to TOB (The Warehousing Note) for the amount to be financed by TOB, an assignment of the individual borrower's note and trust deed/mortgage, and a trust receipt.

e. Upon closing of the loan transaction, TOB would provide plaintiff with funds necessary to make the individual loan. Those funds would be disbursed to the individual borrower. The Warehousing Note would be delivered to TOB. The Individual Borrower's Note was normally held by plaintiff pursuant to a trust receipt pending the plaintiff's resale of the obligation.

8. After closing a number of individual loans, plaintiff compiled the Individual Borrower's Notes and other documents into "loan packages," and sold them to institutional investors. Upon the sale of the loans, plaintiff delivered the Individual Borrower's Notes to the purchaser and normally applied the sale proceeds to repayment of the corresponding Warehousing Notes to TOB.

9. To secure the loans plaintiff obtained from TOB, plaintiff executed certain security agreements dated October 29, 1981 and June 17, 1982 and a financing statement encumbering all of plaintiff's "accounts, chattel paper, documents, instruments and general intangibles, now existing or hereafter arising, and in all proceeds thereof,"

including plaintiff's rights under any mortgage servicing agreements. The financing statement was properly filed on or about November 2, 1981.

10. The Individual Borrower's Notes in all of the GEM loans were held by plaintiff pursuant to trust receipts. On or after October 7, 1982, TOB obtained from plaintiff physical possession of 100 of the 101 original Individual Borrower's Notes securing the GEM loans.

11. TOB filed an action to foreclose its security interests in the Circuit Court of the State of Oregon for Jackson County on November 5, 1982.

12. In connection with TOB's foreclosure action and pursuant to a stipulation between the parties, defendant William E. Brock was appointed receiver of all the assets of plaintiff by the state court on November 5, 1982.

13. For a time after his appointment, the receiver continued to operate the business of plaintiff.

14. Prior to the appointment of a receiver, plaintiff had numerous accounts at TOB, including the following:

| Account Name | Account Number |
|---|---|
| General or Operating | 12–471–771 |
| Savings | 12–04937–5 |
| Bancontrol Warehouse | 12–471–782 |
| FNMA Custodial | 12–511–932 |
| General Custodial | 12–511–943 |
| Construction Trust | 12–511–547 |
| Medford Special | 12–511–954 |
| Eugene Special | 12–103–359 |
| Payroll | 12–461–563 |

15. On or about October 13, 1982, TOB set off accounts described above as plaintiff's "General" and "Savings" accounts against obligations owing to TOB from plaintiff. A total of $273,221.84 was set off and $260,856.37 of that amount was applied to outstanding loans. The balance, $12,365.37, was transferred into account No. 01–236–700 and designated by TOB as a "suspense account."

16. On or about November 19, 1982, the receiver transferred all or most of the funds in the accounts described in para-

graph 14 above to new accounts, with different account numbers, at TOB in the receiver's name.

17. TOB now holds the following amounts in the "suspense account" and accounts of the receiver:

| Account Number | Account Name | Amount |
| --- | --- | --- |
| 01 236 700 | Suspense | $ 12,365.37 |
| 12 631 700 | Medford Special Trust Account (Receivership) | $ 46,391.00 |
| 12 631 689 | General Custodial (Receivership) | $ 1,279.68 |
| 12 631 733 | FNMA Custodial (Receivership) | $ 65,343.18 |

18. There has been no activity in the accounts described in admitted fact 17 since April 20, 1983, the date the bankruptcy petition was filed. No interest has been credited on those accounts since they were opened.

19. During the year prior to the order for relief in this proceeding, plaintiff had the following accounts at other banks:

| Bank | Account Name |
| --- | --- |
| Jefferson State Bank | Payroll |
| Jefferson State Bank | Medford Special |
| Oregon Mutual Savings Bank | Savings |
| Medford State Bank | Corporate |
| Old National Bank | Auburn Warehouse |
| Old National Bank | Everett Warehouse |
| Old National Bank | Auburn Special |
| Old National Bank | Everett Special |
| First Interstate Bank | Montana Board of Housing |
| First Interstate Bank | Boise Special |

20. The receiver continued to use the accounts in his name at TOB and some of the other banks' accounts after his appointment and prior to the order for relief in this proceeding, making deposits and/or withdrawals into the accounts.

21. On or about October 28, 1982, plaintiff made a loan to Mr. David Hansen in the approximate principal amount of $50,-000 to finance the purchase of real property located in Montana. Plaintiff is now and has been at all material times the owner and holder of Mr. Hansen's obligation. Mr. Hansen has made monthly payments of principal, interest, taxes and insurance on that loan to plaintiff since the loan was made.

On August 1, 1983, TOB filed a proof of claim in the bankruptcy case alleging a claim in an approximate amount of $1,000,-000 plus interest. It alleged further that this claim is secured by collateral which includes, but is not limited to, the items mentioned in stipulated fact number nine.

At trial the evidence indicated that after his appointment the receiver, having no significant warehousing funds available for his use, attempted to continue the debtor-in-possession's business with its own funds. To accomplish this task he continually shifted funds among the debtor-in-possession's many bank accounts. The receiver did not keep records of these transactions in a manner which would enable third parties to easily and accurately trace all the account funds.

TOB claims right to the debtor-in-possession's funds in all the deposit accounts in its bank and in others, except for the Jefferson State Bank-Medford Special Account ($11,773.02), the Oregon Mutual Savings bank account ($1,863.53), and the Old National Bank-Everett Warehouse Account ($399.06) as either collateral or proceeds of collateral in which it holds a perfected security interest pursuant to its security documents heretofore described.

CFM claims TOB does not have a validly perfected security interest in the funds in any of the deposit accounts listed; thus, as an "ideal" lien creditor pursuant to 11 U.S.C. § 544(a)(1) ORS 79.3010(1) grants it superior right to those funds.

A secured creditor which alleges it holds a properly perfected security interest in collateral and what it alleges are its proceeds has the burden of proof on that issue. *In re Gibson Products of Arizona*, 543 F.2d 652, 657 (9th Cir.1976) *cert. denied* 430 U.S. 946, 97 S.Ct. 1583, 51 L.Ed.2d 794 (1976); *In re Guaranteed Muffler Supply Co.*, 1 Bankr. 324, 330 (Bankr.N.D. Ga.1979); *In re Conklin's, Inc.*, 14 Bankr. 318, 320 (Bankr.D.S.C.1981). In addition, where an insolvency proceeding has been instituted, as here, triggering the application of ORS 79.3060(4) to the facts the secured creditor has the burden of identifying his own proceeds for purposes of that

subsection. *Gibson, supra*, 543 F.2d at 657 [1].

From court testimony in trial and post-trial memoranda filed by the parties, this court has determined the deposit accounts at issue contain the following types of funds:

1. *Application Deposits*, as described in paragraph five of the stipulated facts.

2. *Commitment or Loan Origination Fees.* CFM received this fee from the individual borrower for arranging a loan for that borrower.

3. *Service Fees.* CFM had service agreements with several investors. These investors included Investors Insurance Corp., Excess Fund Housing, State of Oregon Housing, National Bank of Alaska, Montana Board of Housing, Nabalaska & Co., and Linclon Savings and Loan. Pursuant to the terms of specific agreements, CFM collected principal and interest payments from borrowers, and collected "reserve" payments (consisting of tax and insurance installments) from borrowers. In addition, it might have handled collection activities, inspected properties and pursued foreclosures. For this it earned a service fee.

4. *Principal and Interest Payments on Notes Owned by Investors.* These payments were made by individual borrowers, collected by CFM under servicing agreements and had not been forwarded to the investor-owner of the individuals' promissory notes at the time the bankruptcy petition was filed.

5. *Principal and Interest Payments on the Notes Funded by CFM and Proceeds from Sale of those Notes.* On occasion CFM used its own funds to finance loans to individual borrowers and held their promissory notes as their own property. On occasion it sold those notes to third parties.

6. *Principal and Interest Payments on GEM Notes Funded by TOB.* TOB provided the funding for 101 GEM loans to individual borrowers. The individual promissory notes had not yet been sold by CFM to an investor at the time TOB took possession of them around October 7, 1982.

7. *Reserve Payments Made on Paragraph Four Notes.*

8. *Reserve Payments Made on Paragraph Five Notes.*

9. *Reserve Payments Made on Paragraph Six Notes.*

10. *Proceeds from Sale of Office Equipment and Vehicle.*

11. *Tax Refunds.*

12. *Theft Loss Return Funds.*

13. *Proceeds from Sale of FNMA Stock and Charter Financial Stock.*

The accounts described in the stipulated facts are "deposit accounts" within the meaning of ORS 79.1050(1)(e). ORS Chapter 79, which governs secured transactions, does not apply to the transfer of an interest in a "deposit account" "except as provided with respect to proceeds as defined in ORS 79.3060...." ORS 79.1040(12). ORS 79.3060(1) states "... money, checks, deposit accounts and the like are 'cash proceeds'...."

Although CFM and TOB through their in-court arguments, and trial memoranda filed herein, have taken inconsistent positions from time to time regarding whether they are identifying the deposit accounts as collateral or proceeds of collateral the deposit accounts at issue, if they are proceeds from collateral held, can only be "cash proceeds" as defined by ORS 79.3060(1) and as such the rights and priorities to them would be governed by Chapter 79. Deposit accounts cannot be the collateral itself.

Unless otherwise agreed by the parties, if a secured party has a security interest in the underlying collateral, it also has rights in the proceeds. ORS 79.2030(3). Proceeds are "whatever is received upon the sale, exchange, collection or other disposition of collateral ...." ORS 79.3060(1). As

---

**1.** Although *Gibson* involved an issue of preferential transfer, this court believes the rationale stated therein for placing this burden, that is, the creditor is in a better position to trace his proceeds, applies to any issue arising within the context of ORS 79.3060(4).

insolvency proceedings were instituted against CFM, the TOB's right to such proceeds is further defined and circumscribed by the provisions of ORS 79.3060(4). The parties agree that the subsections of that statute applicable to the facts before the court are (a) and (d). Before TOB may claim proceeds under subsections (a) or (d) of 79.3060(4), it must demonstrate it has a perfected security interest in those proceeds.

The first issue that this court must determine is whether the funds in the deposit accounts are proceeds of collateral in which TOB holds a perfected security interest. The court will analyze each type of fund in the deposit accounts. This analysis will look to proof of the attachment of a security interest in the alleged underlying collateral, a nonavoidable perfection of that security interest, and proof that the funds in the accounts are proceeds of that collateral.

If the court finds TOB holds a perfected security interest in any of the funds as proceeds of its collateral, it will then determine if TOB has met its burden of proof in identifying those deposit accounts containing only such proceeds for purposes of ORS 79.3060(4)(a).

For purposes of applying ORS 79.-3060(4)(d) this court will then determine whether the right to proceeds as described therein should be counted from the day the state receivership action was instituted, or the day the debtor-in-possession filed its bankruptcy petition, or both.

This court will determine the funds, if any, to which TOB is entitled under (4)(d) as it has interpreted that subsection.

Finally, if this court finds TOB wrongfully withheld funds in CFM accounts it shall determine whether TOB should be required to pay interest on those funds, and if any, to what extent.

### Application Deposits

■ The potential borrower signed an application for a mortgage loan and simultaneously paid an "application fee" required by the application. It is not clear to this court whether TOB claimed these deposits as proceeds of an "account" or of a "general intangible." For the court's purposes this is unimportant as TOB holds a perfected security interest in both "accounts" and "general intangibles" by means of its security agreements and financing statement described hereinabove.

Whether it be an "account" or a "general intangible," the application is a bundle of contract rights which, before the amendments to the Uniform Commercial Code in 1972 fell into its own collateral category. Prior to 1972, U.C.C. § 9—106 provided:

"Contract right" means any right to payment under a contract not yet earned by performance and not evidenced by an instrument or chattel paper ...

Reasons for 1972 Change
The term "contract right" has been eliminated as unnecessary. As indicated by a sentence now being eliminated from Section 9—306(1), "contract right" was thought of as an "account" before the right to payment became unconditional by performance by the creditor ... The term has been troublesome in creating a "proceeds" problem where a contract right becomes an "account" by performance; in the Code's former denial that there could be any right in an account until it came into existence (former Section 9—204(2)(d) ), notwithstanding a security interest in the pre-existing contract right; and in the danger of inadequate description in financing statements by claiming "accounts" or "general intangibles" when before performance they should have been described as "contract rights"; and in other respects. U.C.C. § 9—106 (1972).

The identification of "proceeds" from collateral other than concrete property can be difficult. Where, as here, the collateral consists of a bundle of CFM's rights and obligations in the form of a contract, I believe the first task in the identification process is to define CFM's rights. This is done through the traditional legal process of contract interpretation. If the contract terms are unambiguous, they speak them-

selves. If the contract terms are ambiguous, the court may use parol evidence to clarify them. 1 Corbin, *Contracts* § 95 (1963). After CFM's rights are identified, the court must apply the Uniform Commercial Code's definition of proceeds to the facts before it. That which CFM has received by contract terms will be proceeds only if the item is so received as a result of the disposition, in some form, of one of the contract rights. Within this context I would define "disposition of a right" as "exercise of a right which, *by its nature,* reasonably encompasses a right to that which comes to the contracting party as a result of the exercise."

CFM had a right to collect the application deposits. The contract is silent as to the purpose of the deposits. Parol evidence established they were consistently applied for the benefit of the potential borrower. The facts demonstrate the right to *collect* deposits did not encompass a right in the deposits themselves. Thus, there was no disposition of collateral within the meaning of ORS 79.3060(1) and the deposits were not proceeds of TOB's collateral.

### Principal and Interest Payments Made on Notes Owned by Investors

CFM collected these payments pursuant to the terms of various service agreements it had entered into with investors. The parties agree TOB has a validly perfected security interest in the service agreements. They disagree as to whether that fact establishes TOB's right to the principal and interest payments CFM collected pursuant to its rights and obligations under the service agreements.

By terms of the agreements, CFM was required to segregate and hold all funds collected on behalf of the investor in a separate trust account. CFM was to remit from this account at specified times to the investors all principal and interest payments, less its service fee. It is clear from the contract CFM's right to *collect* the principal and interest payments did not encompass any rights to the principal and interest payments themselves. Thus, those payments cannot be "proceeds" of the servicing agreements as defined by this court.

Rather, the principal and interest payments are proceeds of the promissory notes. Although TOB held a security interest in "instruments" which, by definition includes promissory notes, ORS 79.1050(i), evidence established the security interest was never perfected in the investors' notes as TOB never obtained possession of those notes. Perfection of a security interest in instruments is gained only by taking possession of the collateral. ORS 79.3040(1). As TOB had no perfected security interest in the notes, it had no perfected security interest in the notes' proceeds. ORS 79.-3060(3). This court makes no determination regarding the rights of CFM and third party investors in the proceeds of these notes.

TOB further argues that in receiving payments CFM obtained sufficient rights in the payments under ORS 79.2030(1)(c) for the bank's security interest to attach to those payments. It states a debtor's rights in collateral do not have to be absolute to support a finding of attachment. The court finds this argument inapposite to the facts before it. ORS 79.2030(1) and case law interpreting that subsection address when a creditor's security interest attaches to underlying collateral. It does not address under what circumstances a creditor has a perfected security interest in proceeds of collateral. This latter issue is covered by the provisions of ORS 79.3060. As I earlier indicated, the funds at issue in this case by Code definition can be only proceeds.

### Principal and Interest Payments on Notes Funded by CFM and Proceeds from Sale of those Notes

These funds are proceeds of the promissory notes within the court's definition given above. TOB holds a security interest in "instruments." Although the evidence was unclear as to which promissory notes were so treated it demonstrated CFM often executed "trust receipts" in favor of TOB for promissory notes CFM held. These "trust

receipts" proported to appoint CFM as trustee to hold the promissory notes "in trust" for TOB. TOB produced no evidence it ever possessed these notes.

Under the Uniform Commercial Code, a creditor cannot perfect a security interest in instruments by leaving possession of them with the debtor or debtor's agent even if the debtor holds them pursuant to an agreement with the creditor. *In re Staff Mortgage and Investment Corp.*, 550 F.2d 1228, 1230 (9th Cir.1977); *Heinicke Instruments Co. v. Republic Corp.*, 543 F.2d 700, 702 (9th Cir.1976); U.C.C. § 9—305 comment 2 (1981). The only exceptions to that rule are under ORS 79.3040(4) and (5) which are inapplicable to the facts before the court.

For the reasons given above in the discussion about the principal and interest payments on investors' notes, TOB has no perfected security interest in the proceeds of CFM's promissory notes by means of ORS 79.2030(1)(c). The debtor-in-possession's right as a lien creditor in these notes and their proceeds is thus superior to TOB's interest. ORS 79.3010(1)(b).

### Principal and Interest Payments on GEM Notes Funded by TOB

TOB provided financing to CFM to fund 101 Growing Equity Mortgage loans to third parties. For all GEM loans CFM held the third parties' notes pursuant to "trust receipts" as described above. There is no question TOB had a security interest in the promissory notes as instruments pursuant to the terms of its October 29, 1981 and June 17, 1982 security agreements. For the reasons described above the "trust receipts" did not perfect TOB's security interest in those notes. The facts show TOB perfected its interest in 100 of the notes on October 7, 1982 when the bank's representative went to CFM's offices and picked up the notes. TOB obtained possession of the last note sometime thereafter. All proceeds flowing from the notes after October 7, 1982 are proceeds in which the bank has a perfected security interest.

TOB argues at the time it perfected its security interest in the promissory notes by possession it also became entitled to proceeds CFM had received from the notes prior to possession. "Proceeds" is *"whatever* is received upon the sale, exchange, collection or other disposition of collateral" (emphasis added) ORS 79.3060. This definition contains no language limiting proceeds by receipt date. Once the creditor has perfected his security interest in the underlying collateral he also has a perfected security interest in *all* proceeds of that collateral. A potential limitation on the creditor's right to proceeds might arise in the event it lost the priority race under the rules of ORS 79.3120(6). Here, however, TOB clearly won that race by perfecting on October 7, 1982. The debtor-in-possession did not obtain its lien status until April 20, 1983. Thus, all proceeds flowing from the notes before October 7, 1982 are also proceeds in which the bank has a perfected security interest.

### Service Fees

As indicated, under the service agreements, in which TOB holds a perfected security interest, CFM earned fees for collection and management services rendered to investors. It is this court's belief when CFM exercised its right to such fees by withholding the designated amount in payment of fees from principal and interest payments, it disposed of that right within the court's definition and generated proceeds in which TOB holds a perfected security interest.

CFM states any service fees earned for services performed by the receiver are outside the scope of TOB's security agreements covering CFM's service agreements with investors. It supports this statement with the cite to one case and nothing further. I have reviewed that case and found only one legal theory upon which CFM may possibly be basing this argument. ORS 79.1040(6) states Article 9 does not apply to ". . . a transfer of a right to payment under a contract to an assignee who is also to do the performance under the contract..."

Making for the moment the questionable legal assumption the receiver was an "assignee" within the meaning of the statute, does the application of this statute to the facts before this court eliminate TOB's security interest in the service agreements and their proceeds? This court believes not. ORS 79.1040(6) simply excludes from the provisions of Article 9 certain non-financing transactions such as that of a total assignment of a contract under which the assignee is to take over performance. G. Gilmore, *Security Interests in Personal Property* § 10.5 (1965). That section does not wipe out the security interest a creditor, for financing purposes, as here, might have already taken in the contract to be assigned.

There is nothing inherent in a receiver's powers and duties which would eliminate TOB's rights to service fees earned by the receiver. "It is a well-established principle that a liquidator or receiver occupies no better position than his insolvent occupied at the time of insolvency.... He takes the property and rights of the one for whom he acts, subject to the same equities and defenses in others that existed prior to insolvency." *Korlann v. E—Z Pay Plan, Inc.,* 247 Or. 170, 178, 428 P.2d 172, 176 (1967).

### Commitment or Loan Origination Fees

This fee was provided for in the potential borrower's loan application. Two different forms of applications were introduced into evidence. One unambiguously states: "Applicant ... agrees ... to pay to Charter First Mortgage, Inc., a loan fee of ——% of the amount of the loan commitment at the time same is delivered to us and ... it is agreed that your fee shall be deemed to be earned upon the receipt by us of a loan commitment in other amount or terms accepted by us."

The second fee application is more ambiguous and states: "I ... further agree to pay a fee of 1% of the amount of the loan applied for herein as liquidated damages should I be unwilling to accept a commitment secured or loan approved as a result of this application."

CFM's principal gave parol evidence that after CFM had obtained warehouse financing for the loan and secured a purchaser for the loan it issued a commitment letter to the potential borrower pledging to reserve funds for the loan under specified terms and conditions. CFM takes the position it earned its commitment fee when the commitment letter was issued. The principal further testified that if the applicant withdrew his application before CFM issued the commitment letter CFM refunded the commitment fee deposit.

This court finds both by the terms of the contract and by the parol evidence interpreting it the debtor's right to a commitment fee ultimately would, by its exercise, generate proceeds within the court's definition.

By the terms of the contracts, however, there was a condition precedent which CFM had to meet before it could exercise this right. This condition was the issuance of a commitment to the borrower. Prior to its exercise (or disposition), the right to a fee generated no proceeds.

CFM's principal testified that during the period from October 27, 1982 to April 20, 1983 CFM held funds transferred to it by potential borrowers who were eager to receive financing but to whom CFM had not issued commitment letters. TOB would not have a perfected security interest in these funds. TOB would have a perfected security interest in commitment fees deposited which CFM had earned by issuing commitment letters.

### Reserve Payments Made on all Notes

CFM collected mortgagors' funds which it applied to payment of the real estate taxes and insurance expenses arising in connection with the real estate securing the loans. CFM's right to collect these reserves arose out of the mortgage servicing agreement with investors or the mortgage applications with borrowers. As earlier indicated TOB held a perfected security interest in these contracts. The contracts indicate the funds are to be used only for the

purposes to which they were actually applied. The right to *collect* reserve funds to be applied to the mortgagors' obligations is not a right which reasonably includes a right in CFM to the funds themselves. Thus, in exercising its right to collect these funds CFM is not creating proceeds from that right.

TOB has argued, as it did with regard to the principal and interest payments collected by CFM off investors' notes, that by collecting reserves CFM obtained sufficient rights in them under ORS 79.2030(1)(c) for the bank's security interest to attach to the reserves. As indicated above the reserve funds can be only proceeds. Thus, TOB's argument is without merit.

The reserve funds by definition are also not proceeds of the promissory notes. CFM's right to collect reserves arose out of the contracts, not the promissory notes. Thus, any reserves CFM collected under the terms of contracts reflecting GEM promissory notes after TOB took possession of those notes are not proceeds arising from the notes as a result of TOB's perfection of its security interest in those notes.

### Proceeds from Sale of Office Equipment and Vehicle

CFM's principal testified that CFM sold some typewriters, desks and miscellaneous office equipment in the spring of 1983. CFM deposited the proceeds from their sale in the regular course of business into one of its bank accounts. She testified further that CFM's Mercedes was sold in December of 1982. The funds were received immediately. Part of the sale proceeds went to Central Point State Bank to pay off its lien on the vehicle and the balance went into CFM's bank accounts.

No security documents were produced by TOB to support its alleged security interest in the equipment and the vehicle. Both the vehicle and the office equipment are catagorized by the Uniform Commercial Code as "goods." ORS 79.1090. TOB's security agreements dated October 29, 1981 and June 17, 1982 do not cover "goods." As TOB has no security interest in the goods it

has no security interest in proceeds of those goods. ORS 79.3060(3).

### Proceeds from FNMA Stock and Charter Financial Stock

CFM's principal testified federal regulations required CFM to own FNMA stock. CFM had possession of the stock certificates. In October, 1982 CFM decided to sell the stock. It transferred the certificates to its broker for that purpose. The broker sold the stock and remitted $25,-119.24 to CFM, which amount was deposited in CFM's bank account on October 27, 1982. CFM stock certificates are "instruments" within the meaning of ORS 79.-1050(i). TOB has a security interest in CFM's instruments. TOB did not perfect that interest as it never had possession of the certificates as required by ORS 79.-3040(1).

The bank argues the proceeds from the stock are in fact proceeds from a general intangible. They identify the general intangible as a chose in action which CFM held to enforce its broker's duty to pay its customer. This reasoning is clearly fallacious. Without the stock there would have been neither funds nor a right to receive funds. The stock sale generated the funds; the funds were proceeds of the stock. As TOB had no perfected security interest in the stock it has no interest in the funds CFM obtained on the sale of the stock.

CFM's principal testified that CFM formed Charter Financial Corporation in 1976 or 1977 as a holding corporation. The new corporation never functioned as envisioned. CFM redeemed its stock in Charter Financial in late 1982 and received funds in three installments into its accounts. No other evidence was introduced regarding the source of these funds. Although TOB claims these funds, the basis of the claim is not clearly stated. On the record this court must find the funds were received as a result of the redemption of Charter Financial stock. CFM's principal testified it always had possession of the Charter Financial stock certificates. Thus, TOB could not have held a perfected security interest

in this stock and has no claim to the redemption funds.

### Theft Loss Funds

CFM's principal identified an entry on a deposit slip dated March 25, 1983 as representing insurance funds for some stolen equipment. Insurance payable for loss of collateral is proceeds with one exception. ORS 79.3060(1). As indicated above, TOB had no security interest in the equipment and thus had no security interest in the insurance proceeds.

On December 2, 1982, $10,000 was deposited into CFM's Oregon Bank Medford Special account. An exhibit introduced into evidence indicates this amount was funds arising from a theft loss. TOB failed to introduce any evidence to indicate its right to those funds.

### Tax Refunds

On December 3, 1982, CFM deposited $43,308.53 into one of its accounts. These funds were tax refunds from the U.S. Treasury. The right to receive tax refunds is a general intangible. *In re SMS, Inc.*, 15 Bankr. 496, 499 (Bankr.D.Kan.1981); Davenport & Murphy, *Secured Transactions*, 76–78 (1978). CFM received the tax refunds on disposition of the right within the court's definition. The refunds are proceeds of the right to the refund. As TOB had a perfected security interest in the right to a refund as a general intangible pursuant to its duly filed security agreements it had a perfected security interest in the tax refunds.

### Application of ORS 79.3060(4)(a)

Under pre-Uniform Commercial Code law a lien holder was entitled to trace and take the proceeds received by the debtor. U.C.C. § 9—306 comment 2(a); Gilmore, *supra*, § 45.9 at 1337. This right, however, placed the burden on the lien holder to present sufficient evidence of tracing to support the claim to the proceeds. He was required to identify those proceeds. U.C.C. § 9—306 comment 2(a). The UCC continues this requirement if the parties have not

instituted insolvency proceedings. U.C.C. § 9—306(2) and (3)(b). *Michigan Nat'l Bank v. Flowers Mobile Home Sales, Inc.*, 26 N.C.App. 690, 217 S.E.2d 108, 112 (1975); *Brown & Williamson Tobacco Corp. v. First Nat'l Bank*, 504 F.2d 998, 1002 (7th Cir.1974). It also continues this requirement, under certain circumstances, where the parties have instituted insolvency proceedings. Paragraphs (a), (b) and (c) of ORS 79.3060(4), which determines the extent of a secured creditor's right to proceeds if such proceedings have been instituted, deal with "identifiable" proceeds. "As to such proceeds—which can still be identified or traced as having been received on the disposition of the collateral—the secured party's rights are not affected by the insolvency proceeding ..." Gilmore, *supra*, § 45.9 at 1338.

In *Funk & Sons, Inc. v. Sullivan Equipment, Inc.*, 89 Ill.2d 27, 59 Ill.Dec. 85, 431 N.E.2d 370 (1982) the court held that for proceeds to be identifiable within the meaning of the statute, they must be capable of being traced into the existing account using the "lowest intermediate balance" rule. Whether the court requires use of this or another accounting method for tracing, I believe that it must be satisfied that the funds are those which were actually received on disposition of the collateral. No such showing was made on facts before this court, whether the funds in the accounts be scrutinized as of the date the state court receiver was appointed or the date CFM filed its bankruptcy petition. No evidence of account withdrawals was presented; not all records of deposit could be identified. Considering the lack of financial records during the receivership, the number of accounts held, and the fact of common interaccount transfers after TOB's freeze on three accounts, it is likely the tracing task would have been impossible.

As this court has determined not all the funds in the accounts are proceeds to which TOB is entitled and as those to which TOB is entitled cannot be identified within the meaning of ORS 79.3060(4)(a) the bank has

a right to those proceeds, if at all, only pursuant to ORS 79.3060(4)(d).

### "Insolvency Proceedings" within ORS 79.3060(4)

The Uniform Commercial Code defines insolvency proceedings as "any assignment for the benefit of creditors or other proceedings intended to liquidate or rehabilitate the estate of the person involved." ORS 71.2010(22). The statutory language leads me to believe it was the intent of the drafters to include within its terms receiverships instituted under state law. The definitional language certainly is too broad for me to conclude insolvency proceedings under the statute are limited to bankruptcy proceedings. Indeed such a construction could lead to the impermissible result of state law legislating on bankruptcy. Conversely, the definition certainly includes a bankruptcy proceeding.

Under the facts of this case, two insolvency proceedings within the meaning of ORS 71.2010(22) were instituted. TOB argues this court should treat the date the receiver was appointed as the institution of insolvency proceedings for purposes of ORS 79.3060(4); CFM insists such proceeding was instituted on the date it filed bankruptcy. There is a third possibility which neither party has suggested. Perhaps, under the facts, the court should recognize two insolvency proceedings within the context of ORS 79.3060(4). The reference to such proceedings in that statute is ambiguous enough to support the argument. The answer to this question is crucial because under subsection (d) the creditor's proceeds are limited to an amount not greater than the amount of any cash proceeds received by the debtor within ten days before that key date. Here TOB has not demonstrated CFM received any cash proceeds within ten days before April 20, 1983.

An appropriate answer to the question is not to be found in the statutory language; rather it will be reached by first identifying the purpose of the statute as interpreted by case law.

The purpose of ORS 79.3060(4) is to cut back the secured party's rights to proceeds in the event insolvency proceedings are instituted. Under subsections (a), (b) and (c) the creditor may obtain the described proceeds if he can identify them. If the creditor has allowed his proceeds to be commingled in the debtor's deposit accounts, the creditor may receive only that amount determined under the formula described in subsection (d). ORS 79.3060(4)(d) states:

(4) In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest only in the following proceeds: ...

(d) In all cash and deposit accounts of the debtor in which proceeds have been commingled with other funds, but the perfected security interest under this paragraph is:

(A) Subject to any right of setoff; and

(B) Limited to an amount not greater than the amount of any cash proceeds received by the debtor within 10 days before the institution of the insolvency proceedings less the sum of: (i) the payments to the secured party on account of cash proceeds received by the debtor during such period, and (ii) the cash proceeds received by the debtor during such period to which the secured party is entitled under paragraphs (a) to (c) of this subsection.

The purpose of subsection (d) is to eliminate the pre-Uniform Commercial Code theories of tracing and force the secured creditor to pay close attention to his debtor's business affairs. Gilmore, *supra*, § 45.9 at 1340. It is the opinion of one commentator that the formula in subsection (d) will in most cases reduce the amount of proceeds a secured creditor may claim as the debtor's bank account will often contain deposits of proceeds made for several weeks preceding the institution of insolvency proceedings. *Id.* at 1340.

Because of the ambiguity of the phrase "any cash proceeds" there is presently a split of authority as to the extent of the

3060(4)(d) interest which the creditor is granted by the statute. The language may refer to any cash proceeds from whatever source derived, *Gibson, supra,* 543 F.2d at 656, or it may mean the proceeds derived only from the collateral of the secured creditor asserting the interest. *Fitzpatrick v. Philco Finance Corp., (In re Sikking Co.)* 491 F.2d 1288, 1291–92 (7th Cir.1974). In *Gibson* the Ninth Circuit concurred with the secured creditor that the statutory language of the Arizona statute, which is the equivalent of ORS 79.-3060(4)(d), granted it a perfected security interest in the entire funds entering the account in the ten day period although only $10 of the amount represented proceeds from its collateral. *Gibson, supra,* 543 F.2d at 655. Under the facts, however, the court further found the interest in any funds in excess of those the creditor could identify as proceeds of its collateral constituted a voidable preference. *Id.* at 657.

Although the *Gibson* decision has engendered significant negative comment this court is bound by its interpretation of U.C.C. § 9—306(4)(d) and must consider it when it weighs on which date or dates insolvency proceedings are appropriately to be considered instituted.

■ This court believes if more than one insolvency proceeding has been instituted one date should control for purposes of ORS 79.3060(4)(d) and that date should be the date the bankruptcy petition is filed. I reach this decision for several reasons. First, bankruptcy law is federal law which should control for purposes of the (d) determination just as it controls many other matters involving the debtor's insolvency when a bankruptcy petition has been filed. Second, the interest *Gibson* grants to secured creditors in assets which are not proceeds of their collateral should be required to face the crucible of the bankruptcy trustee's avoiding powers. This could not happen if the grant were determined to take place at the date state insolvency proceedings were instituted if that occurred outside 90 days (in most cases) of the bankruptcy filing. Note, *Bankrupting the Pro-*

*ceeds Section: Recent Interpretations of Section 9—306(4)(d) of the Uniform Commercial Code,* 55 Tex.L.Rev. 891, 910 (1977). Last, under the Bankruptcy Code the date the petition is filed is the focal date for making many determinations. From a practical point of view, the trustee is accustomed to looking to that date. As he is charged with the responsibility of determining creditors' interests in property, the use of the bankruptcy date eliminates some complexity for him. If the date under ORS 79.3060(4)(d) were the date of first insolvency proceedings, on occasion that date could be so far in the past it would be extremely difficult for the trustee to determine the financial facts upon which to base an opinion as to a creditor's interest in that claimed. This problem could be intensified if, as is possible under *Gibson,* more than one secured creditor were vying for all the cash proceeds received by the debtor within ten days before institution of insolvency proceedings.

The parties have cited two cases which they allege address this issue. The court finds neither case useful as precedent. In *In re Critiques, Inc.,* 29 Bankr. 941 (Bankr.D.Kan.1983) the court under similar circumstances reached the same result as did this court but without analysis or comment. In *Matter of Conklin's, Inc.,* 14 Bankr. 318 (Bankr.D.S.C.1981) the court did not have before it a case involving two separate insolvency proceedings. The case involved a chapter 11 reorganization which was converted to a chapter 7 liquidation. 11 U.S.C. § 348(a) does not treat these two methods of bankruptcy as separate proceedings.

■ As TOB has not shown CFM received any cash proceeds within ten days before April 20, 1983, it is not entitled to any funds in the deposit accounts. TOB argues the court should exercise its equitable powers to override the effects of ORS 79.3060(4)(d) where, as they assert here, the deposit accounts consist almost entirely of proceeds. It states this court has authority to take this step pursuant to 11 U.S.C. § 552(b). That subsection does

not provide me with authority to make such an order. That subsection only addresses possible treatment of *post-petition* proceeds and authorizes the court to *limit* the creditor's interest in those proceeds.

In addition, this court has found the deposit accounts do not consist almost entirely of proceeds to which TOB validly can make claim.

Finally, it is clear the intent of subsection (d) was to require the creditor to bird-dog his proceeds or pay the consequences. Gilmore, *supra*, § 45.9 at 1340. Equitable powers should not be exercised then to rescue the creditor from the very consequences which the statute intended in the absence of watchfulness.

### Interest on Amounts Withheld

CFM insists TOB is obligated to pay interest on all amounts to which it has refused CFM access. Those amounts are the funds in CFM's Oregon Bank account numbers 01236700, 12631700, 12631689 and 12631733.

ORS 82.010(2)(a) provides:

(2) The rate of interest for the following transactions, if the parties have not otherwise agreed to a rate of interest, is nine percent per annum and is payable on:

(a) All moneys after they become due; but open accounts bear interest from the date of the last item thereof.

This court believes the statute requires TOB to pay interest at 9% per annum on the itemized funds from April 20, 1983 until paid in full.

■ The deposit of funds in a checking account in a drawee bank creates a debtor-creditor relationship. *Brown v. New York Life Ins. Co.*, 152 F.2d 246, 249 (9th Cir. 1945); *State v. Tauscher*, 227 Or. 1, 360 P.2d 764 (1961). These funds were placed in accounts which allowed their withdrawal at the pleasure of the depositor. In other words, these funds are payable on demand. The Oregon Supreme Court, in interpreting ORS 82.010(2)(a) stated: "It imposes a duty to pay interest only in those cases in which the law recognizes a duty to pay a certain sum at a certain time and such a payment has not been made." *United Farm Agency v. McFarland*, 243 Or. 124, 133, 411 P.2d 1017, 1022 (1966).

■ These funds were property of the estate. 11 U.S.C. § 541(a). After a bankruptcy petition is filed 11 U.S.C. § 542(b) requires any entity that holds property of the estate payable on demand to pay such property to the trustee. The House Committee on the Judiciary regarding 11 U.S.C. § 542 explained:

Subsection (a) of [§ 542] requires anyone holding property of the estate on the date of the filing of the Petition, or property that the trustee may use, sell, or lease under § 363, to deliver it to the trustee ...

Subsection (b) requires any entity that owes money to the debtor as of the date of the Petition, or holds money payable on demand or payable on order, to pay the money to the order of the trustee ... H.Rep. No. 595, 95th Cong., 2nd Sess. *reprinted in* 1978 U.S.Code Cong. & Ad. News, p. 6325.

CFM, as debtor-in-possession, has all the rights and duties of a trustee. 11 U.S.C. § 1107(a). § 542(b) created a duty to pay as described in *United Farm.*

It is true that such an award is limited to claims where the exact amount of damages is ascertained or ascertainable and the time from which interest runs is easily determined. *S.D.S. Lumber Co. v. Allendale Mutual Ins. Co.*, 563 F.Supp. 608 (D.Or. 1983). Here the parties have agreed on the principal amounts in each account on which demand has been made. The amount owing is ascertainable. The duty to pay an estate asset payable on demand, described in § 542(b), arises when the bankruptcy petition is filed. The amount has become due at that time within the meaning of ORS 82.010(2)(a); interest should be paid from that date.

This Memorandum Opinion contains the court's findings of fact and conclusions of

law and pursuant to Bankruptcy Rule 7052 they will not be separately stated.

An order consistent herewith will be entered.