**ENGSTROM v. WILEY.**

No. 12733.

United States Court of Appeals
Ninth Circuit.

June 29, 1951.

Eggerman, Rosling & Williams and De-Witt Williams, all of Seattle, Wash., for appellant.

Hughes & Jeffers and Joseph L. Hughes, all of Wenatchee, Wash., for appellee.

Before HEALY, Circuit Judge, and FEE and SOLOMON, District Judges.

JAMES ALGER FEE, District Judge.

Northwest Chemurgy Cooperative is a bankrupt. Engstrom is the duly authorized and acting trustee thereof. The preference statutes of the State of Washington, §§ 5831–4 and 5831–6 of Rem.Rev.Stat. of Washington were in full force and effect, and Chemurgy was insolvent within the meaning of these statutes on February 7, 1947, and for at least four months prior to May 29, 1947.

On January 27, 1947, R. M. Wiley sold and delivered to Chemurgy at Wenatchee, Washington, a quantity of wheat. Chemurgy gave Wiley, personally, its check dated that day, payable to him and drawn on the Wenatchee Valley Branch of the Seattle-First National Bank. Wiley deposited this check in the Waterville Branch of the National Bank of Commerce on February 6, 1947. Waterville was his home town, about thirty miles from Wenatchee. The check was paid by the drawee bank out of the funds of Chemurgy then on deposit February 7, 1947. There is no showing as to the state of the account of Chemurgy in the Wenatchee Branch of the Seattle-First National Bank on the date the check was drawn or thereafter to date of payment. We are concerned only with whether the payment of the check by the bank out of the account of Chemurgy was a preference in the amount of $2252.78. The Trial Court found "that payment of said check out of the funds of Chemurgy on deposit with the Wenatchee Valley Branch of the Seattle-First National Bank on February 7, 1947, was not such a transfer to the defendant of the property of said insolvent Northwest Chemurgy Cooperative as to constitute an unlawful preference within the meaning of Rem.Rev.Stat. of the State of Washington, § 5831–4, as the transaction was in substance and effect a cash transaction and

there was no intent on the part of either party to create a debtor-creditor relationship."

At the outset, it is urged that, since the facts are stipulated, this Court must necessarily arrive at a result by consideration of the fact de novo. No such authority is vested in this Court. The Trial Judge has found the facts. The function of this Court is to determine whether his findings are unsupported by substantial evidence and therefore clearly erroneous.

The Trial Court found that the sale and delivery of the wheat and the payment of the check constituted in fact a cash transaction. The wheat came into the possession of Chemurgy. The payment of the price did not therefore diminish the estate of Chemurgy.[1] The wheat and the money were equivalents and were exchanged. It has always been held that a cash sale does not and cannot create a preference.[2] Here there is a cash sale, a completed transaction, an accomplished fact. It is exactly what the parties intended. For this reason, the transaction did not "enable 'Wiley,' one of the creditors of such corporation, to obtain a greater percentage of his debt than any other creditor of the same class." The parties did not create a debt. Wiley was not a creditor. If the agreement had been that he should receive his pay even one day in the future, a debt would have been created.

In this transaction an antecedent debt must by definition have been in existence before payment or there can be no preference.[3]

In a cash sale the conditions of delivery and payment are concurrent. According to the weight of authority, if it be the intention of the parties to accomplish a cash sale, the delivery and payment need not be exactly simultaneous.[4]

Where such a sale is intended, acceptance of a check instead of cash does not change the character of the transaction even if delivery is immediate. Certainly, this it firmly established commercial practice. The law does not run counter to the custom. Chemurgy received the wheat. The check was paid and Wiley got the money. The transaction was consummated in accordance with the expressed design of the parties. There was no diminution of the property of bankrupt[5] by a cash sale, even though the check was cashed in the four months' period.

It is said this result is not correct because of the lapse of time between the delivery of the wheat and the receipt of the cash, because the intention of the parties is that the transaction is not the criterion and because the condition was waived.

There can be no question but that, as appellant strongly urges, the check given to Wiley was not an assignment of the fund in the bank,[6] if there were one.

1. Continental & Commercial Trust & Savings Bank v. Chicago Title & Trust Company Trustee, 229 U.S. 435, 444, 33 S. Ct. 829, 57 L.Ed. 1268.

2. Joseph Wild & Company v. Provident Life & Trust Company, Trustee, 214 U. S. 292, 297, 29 S.Ct. 619, 53 L.Ed. 1003; Yaple v. Dahl-Millikan Grocery Co., 193 U.S. 526, 527, 24 S.Ct. 552, 48 L.Ed. 776; Jaquith v. Alden, 189 U.S. 78, 83, 23 S. Ct. 649, 47 L.Ed. 717.

3. Dean v. Davis, 242 U.S. 438, 443, 37 S. Ct. 130, 61 L.Ed. 419; "Preference implies preceding credit." 4 Remington on Bankruptcy, 4th Ed., § 1694.

4. In re Perpall, 2 Cir., 256 F. 758; In re Perpall, 2 Cir., 271 F. 466; "Cash transactions not preference * * * Absolute simultaneity is not requisite, if the title is not meant to pass until the payment is actually made." 4 Remington on Bankruptcy, 4th Ed., § 1695; see annotation, 31 A.L.R. 585–587, 54 A.L.R. 526.

5. The Court in Stern v. Lone, 32 Wash. 2d 785, 791, 203 P.2d 1074, 1077, 7 A.L. R.2d 1009, uses the diminution of property of the corporation as the test. It is said: "We are primarily concerned here with whether or not the property of the corporation was diminished by a transfer of corporate property to Lone, and if so, was the transfer made more than four months before May 9, 1947, or within that four months? In deciding the question before us, the word 'transfer' is the key word, not 'payment'."

6. Camas Prairie State Bank v. Newman, 15 Idaho 719, 99 P. 833, 21 L.R.A.,N.S., 703; Peninsula National Bank v. Hans

The check was simply an order in the hands of Wiley. But it is also true that the check given by Chemurgy and accepted by Wiley constituted only conditional payment for the wheat.[7] The seller who took the check had a reasonable time to deposit it and receive the cash. Since the check was cashed, it would seem it was presented in reasonable time.

The findings of the Trial Court are conclusive upon this point. The customs and habits of a community have and should have great weight in such a determination. Reasonable time might have one connotation with traders on the stock market in a financial center and another with farmers who receive a check for sale of wheat in a modest marketing town in the interior. The conscientious Trial Judge knew of these factors. The commercial structure of the wheat country could be disturbed by treating a cash sale, common in the daily pratice of the market place, as a transaction on credit because it was paid by check. An illustrative case may, however, be helpful in appraising the result. A farmer sold and delivered wheat and took check in return. As it was after banking hours, he held the check until his next trip to town, two or three weeks later. When payment was refused, he sued to recover the wheat. The Court held he was entitled to prevail against a creditor who had attached upon antecedent debts. People's State Bank of Michigan Valley v. Brown, 80 Kan. 520, 103 P. 102, 23 L.R.A.,N.S., 824.

The case above cited expressly repudiates the doctrine, propounded by authority but also against the weight of the majority, that failure to have actual cash in hand before delivery should be held to show conclusively an intention to extend credit.[8] This brings up a corollary of this doctrine in the second argument of appellant that the state courts of Washington have held that the intention of the parties is of no effect in determining whether there is a preference. There is no question but that a preference can be given and received where both parties are entirely unconscious of any wrong.[9] For wrongful intent is not the essence of preference. The receipt by a creditor of a greater proportion of his debt than another creditor of the same class is the essential.

But, in determining as a fact whether there was a spot cash sale or an extension of credit which created a debt, the Trial Court had the power and duty to consider the intention of the parties. The mere fact that general definitions might indicate that a debt was created where there was any delay or the fact that the seller might have treated the transaction as a debt and thereby lost his rights to recover the wheat is of no significance. If it was the intention to extend credit even for a day or to sell the property on credit,[10] there would be no question. A preference would have been established because a debt would have been created. If the acts of either party or the words which they spoke or

Pederson Construction Co., 91 Wash. 621, 158 P. 246.

7. People's State Bank of Michigan Valley v. Brown, 80 Kan. 520, 103 P. 102, 23 L. R.A.,N.S.. 824; J. I. Case Threshing Machine Co. v. Bargabos, 143 Minn. 8, 172 N.W. 882.

8. Criticizing a passage of Williston on Sales, § 346, the Court says: "Delivery and payment as a practical matter cannot be absolutely simultaneous. Some slight interval between the two acts is inevitable, and the criterion upon which the courts have agreed with substantial unanimity is that such interval does not conclusively prove a total abandonment of title and the right of possession by the

seller, unless under all the circumstances of the case it in fact shows that result to have been intended." People's State Bank of Michigan Valley v. Brown, 80 Kan. 520, 522, 103 P. 102, 103, 23 L.R. A.,N.S., 824.

9. Woods, as Trustee v. Metropolitan National Bank, 126 Wash. 346, 218. P. 266.

10. It is perfectly true that the intention of the parties cannot prevent an extension of credit from transforming buyer and seller into debtor and creditor, where the nature of the transaction clearly appears. Seattle Ass'n v. Luster, 137 Wash., 222 P.2d 843; Seattle Ass'n of Credit Men v. Daniels, 15 Wash.2d 393, 130 P.2d 892.

wrote or the surrounding circumstances show an extension of credit,[11] it would make no difference that both parties may have had an abiding unexpressed intention not to create a debt.[12] This is the usual rule that the evinced intention prevails over mental attitudes.

 Finally, it is said that the condition of concurrent payment was waived by the delay of ten days before the presentation of the check. Waiver and estoppel have their foundation in the intention of the party against whom they are sought to be enforced. Many of the cases indicate that the original sale was for cash but that by some act of the seller the condition has been waived.[13] Where the rights of innocent third parties enter, the technical ground is estoppel [14] and not waiver. Here there are no third parties whose rights must be considered. Since Wiley could have retaken the wheat if the check had not been paid upon February 7,[15] there was an even exchange and the estate of bankrupt was not diminished thereby. But Wiley was never confronted with the situation where he had to choose between suing on the check [16] or attempting to recover the grain. The payment was made. Therefore, he did not waive performance of condition. The Trial Judge has found no waiver or estoppel, but has found that the transaction was a cash sale and that therefore the consummated transaction, consisting of receipt by Chemurgy and cash by Wiley, involved no intention to extend credit, and the condition of payment was not waived. Spot sales of wheat, where there is delivery and a check is received, are daily transactions of the wheat country. These are innumerable. Each cannot be subject to defect.

The result thus attained depends upon an appraisal of the events in the light of the intention of the seller found by examination of his acts and the custom of the locality. The element of chance is thus removed. If the result depended solely upon whether the money was actually paid to the seller after the bar of statute had fallen, as appellant seems to contend, the element of chance would be supreme.[17]

11. The key question is whether there was an extension of credit. The Trial Court has found there was none. The case is thus differentiated from Seattle Ass'n v. Hudson Machinery Co., 35 Wash.2d 680, 214 P.2d 681.

12. Seattle Ass'n v. Luster, Wash., 222 P. 2d 843; Seattle Ass'n v. Daniels, 15 Wash.2d 393, 130 P.2d 892.

13. Seattle Ass'n v. Luster, Wash., 222 P.2d 843; Northwest Hardware Co. v. M. & S. Logging Co., 132 Wash. 413, 232 P. 274.

14. Kirk v. Madsen, 240 Iowa 532, 36 N. W.2d 757; Johnson-Brinkman Commission Co. v. Central Bank, 116 Mo. 558, 22 S.W. 813; see Comer v. Cunningham, 77 N.Y. 391; Hoven v. Leedham, 153 Minn. 95, 189 N.W. 601, 31 A.L.R. 574; Kemper Grain Co. v. Harbour, 89 Kan. 824, 133 P. 565, 47 L.R.A.,N.S., 173.

15. 7 Remington's Revised Statutes of Washington, Annotated, § 5836-52: "Definition of unpaid seller. (1) The seller of goods is deemed to be an unpaid seller within the meaning of this act: (a) When the whole of the price has not been paid or tendered. (b) When a bill of exchange or other negotiable instrument has been received as conditional payment, and the condition on which it was received has been broken by reason of dishonor of the instrument, the insolvency of the buyer, or otherwise. (2) In this part of this act the term 'seller' includes an agent of the seller to whom the bill of lading has been indorsed, or a consignor or agent who has himself paid, or is directly responsible for, the price, or any other person who is in the position of a seller."

16. It is true that, under certain circumstances which are not here present, Wiley could have brought an action of debt or indebitatus assumpsit for this money. But that theory need not trouble us here. The seller at a cash sale is not a creditor although he may become a creditor. The loose definitions of debt help not at all.

17. It is contended this is the holding of Stern v. Lone, 32 Wash.2d 785, 203 P.2d 1074, 7 A.L.R.2d 1009. But there, goods were delivered in the late summer or early fall of 1946, a check was drawn in payment October 30, delivered between

No one could predict when Chemurgy would be bankrupt or even that it would be insolvent. The exact day upon which this line would be established could not have been divined by necromancy. All the situations where the money and property changed hands before the fatal day are innocuous. Where the exchange was made on both parts after the day was passed, all are innocent. Only where the goods were delivered before the day and the check paid afterward would the seller be castigated. If by chance Chemurgy had been able to keep out of trouble for more than ten days longer, this transaction would have been innocent, and others now innocent would have been condemned. The Legislature would not have permitted such an inequitable play of circumstance. As we have seen above, no such inequity was provided for.

The Court found that the sale and delivery of the wheat and the payment of the check was a cash transaction. This finding is based upon the record, supported by substantial evidence and is not clearly erroneous. The payment of the check several days after the delivery of the wheat was not a payment of an antecedent debt. Since the wheat came into the estate of Chemurgy, the payment therefor in cash did not diminish the estate. It is not what the parties may have thought they did which is important, but what was actually done. The whole commercial structure would be disturbed by treating this common, ordinary cash transaction of daily life in the market place as a sale on credit.

The Washington statute had no effect on the transaction. Nor did the cases, Engstrom v. De Vos, D.C., 81 F.Supp. 854, affirmed, Schneidmiller v. Engstrom, 9 Cir., 177 F.2d 196.

The judgment is affirmed.

Christmas, 1946, and January 1, 1947, the four months started running about January 10, and the check was paid Jan-

uary 25. If anything is clear, this was not a cash sale. The chief contention was the check was received in payment.