In re F.H.L., INC., T/A $10–15 Shoe
Store, a Division of Mr.
Henry, Debtor.

John HARGRAVE t/f F.H.L., Inc., t/a
$10–15 Shoe Store, a Division of Mr.
Henry, Plaintiff,

v.

Fred E. BOEHMER, Defendant.

Bankruptcy No. 84–03959.
Adv. No. 86–0037.

United States Bankruptcy Court,
D. New Jersey.

Aug. 25, 1988.

David P. Daniels, Camden, N.J., for debtor.

Kasen & Kasen by John W. Hargrave, Cherry Hill, N.J., for trustee.

OPINION

ROSEMARY GAMBARDELLA,
Bankruptcy Judge.

The matter before the Court is a Complaint filed by John W. Hargrave, Esquire, the Trustee ("Trustee") for the estate of F.H.L., Inc., trading as $10–15 Shoe Store, a Division of Mr. Henry, the debtor herein ("debtor" or "FHL"), against Fred E. Boehmer ("Boehmer") pursuant to 11 U.S.C. §§ 547 and 548. By that complaint, the

Trustee seeks a judgment voiding certain alleged preferential payments made to Boehmer and declaring that payments made pursuant to a certain stock redemption agreement are fraudulent conveyances and/or preferential transfers.

On July 23, 1984, the debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Reform Act of 1978[1] (hereinafter "Bankruptcy Code"). By a notice dated July 24, 1984, and filed with this court on July 27, 1984, the United States Trustee, Hugh M. Leonard, appointed John W. Hargrave, Esquire as interim Trustee of the debtor's estate. The Trustee accepted his appointment on August 1, 1984.

The instant adversary complaint was filed against the defendant, Boehmer, on February 18, 1986. In Count I of the complaint, the Trustee asserts:

1. Boehmer owned fifty percent (50%) of the shares of F.H.L. and was an officer and an employee of F.H.L. until February 1984.

2. Boehmer was an "insider" as defined by 11 U.S.C. § 101(25)[2] for the one year period prior to July 23, 1984, the date of the filing of F.H.L.'s voluntary petition.

3. In September 1983, F.H.L. was indebted to Boehmer in the approximate sum of $28,278.00.

4. Between September 23, 1983 and December 16, 1983, F.H.L. made eleven (11) payments totalling $4,400.00 to Boehmer on account of said indebtedness.

5. On or about February 7, 1984, F.H.L. entered into a written agreement with Boehmer establishing the amount of the indebtedness at $23,878.00. This agreement further provided for the repayment of this indebtedness in consecutive monthly installments of $76.53.

6. F.H.L. made twenty-one (21) payments of $76.53, totaling $1,607.13, towards the satisfaction of the indebtedness. These payments occurred within one year of the date of the filing of F.H.L.'s petition, and were made on account of an antecedent debt to Boehmer.

7. The payments were made while F.H.L. was insolvent and enabled Boehmer to receive more than he would receive as a creditor in this Chapter 7 proceeding if the transfers had not been made and Boehmer received payment of his claim as provided by the Bankruptcy Code.

By Count I of the complaint, the Trustee requests judgment against Boehmer under 11 U.S.C. § 547 voiding the alleged preferential transfers and entering judgment in favor of F.H.L. in the amount of $6,007.13.

In Count II of the complaint, the Trustee, in addition to the allegations of Count I, asserts:

1. Between April 23, 1984 and July 13, 1984, F.H.L. made thirteen (13) payments of $76.53 each to Boehmer on account of the aforesaid antecedent debts totalling $994.89.

2. Said transfers occurred within ninety (90) days of the date of the filing of F.H.L.'s petition and were made on account of an antecedent debt owed to Boehmer.

3. F.H.L. is presumed to be insolvent during the ninety (90) days prior to the filing of its bankruptcy petition.

4. These transfers enabled Boehmer to receive more than he would receive as a creditor in this Chapter 7 proceeding if the transfers had not been made and Boehmer

---

1. The Bankruptcy Reform Act of 1978 was amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984, P.L. 98–353, date of enactment, July 10, 1984. These amendments were effective 90 days after the date of the enactment. The petition herein was filed July 23, 1984, during the interim period of the enactment and effective date of the amendments. Thus, for all relevant purposes herein, the effective legislation is the provisions of the Bankruptcy Reform Act of 1978.

2. Title 11 U.S.C. § 101(25) (currently 11 U.S.C. § 101(30)) states in pertinent part:
(25) "insider" includes—
   (B) if the debtor is a corporation—
   (i) director of the debtor;
   (ii) officer of the debtor;
   (iii) person in control of the debtor;
   (iv) partnership in which the debtor is a general partner;
   (v) general partner of the debtor; or
   (vi) relative of a general partner, director, officer, or person in control of the debtor.

received payment of his claim as provided by the Bankruptcy Code.

By Count II of the complaint, the Trustee requests judgment against Boehmer voiding the alleged preferential transfers and entering judgment in favor of F.H.L. in the amount of $994.89.

In Count III of the complaint, the Trustee asserts:

1. On or about February 7, 1984, F.H.L. entered into a written stock redemption agreement to purchase from Boehmer, 33⅓ shares of stock of F.H.L., representing 50% of all the issued and outstanding stock of F.H.L.

2. The agreed upon consideration to be paid by F.H.L. for the repurchase of the stock was $72,722.00.

3. On February 16, 1984, F.H.L. paid $3,000.00 to Boehmer as the initial installment pursuant to the stock redemption agreement.

4. Between February 24, 1984 and July 13, 1984, F.H.L. made twenty-one (21) installment payments of $223.63, totalling $4,696.23, to Boehmer pursuant to the stock redemption agreement. The total payments made by FHL to Boehmer under the agreement totalled $7,696.23.

5. F.H.L. received less than the reasonably equivalent value in exchange for the payments it made to Boehmer pursuant to the stock redemption agreement.

6. F.H.L. was insolvent on the date the stock redemption agreement was entered into or became insolvent as result of such agreement.

7. F.H.L. was engaged in business at the time the stock redemption agreement was entered into for which the property remaining with F.H.L. represented an unreasonably small amount of capital.

8. The payments made to Boehmer under the stock redemption agreement constitute a fraudulent conveyance under 11 U.S. C. § 548.

By Count III of the Complaint, the Trustee requests judgment declaring the payments made under the stock redemption agreement to be fraudulent conveyances and ordering Boehmer to pay the sum of $7,696.23 to the Trustee.

In Count IV of the Complaint, the Trustee, in addition to the allegations of Count III, asserts:

1. The payments made by FHL to Boehmer under the stock redemption agreement constitute a fraudulent conveyance under N.J.S.A. 25:1–1 et seq. (sic) N.J.S.A. 25:2–1 et seq.

By Count IV of the Complaint, the Trustee requests judgment declaring the payments made under the stock redemption agreement to be fraudulent conveyances and ordering Boehmer to pay the sum of $7,696.23 to the Trustee.

In Count V of the Complaint, the Trustee, in addition to the allegations of Count IV, asserts:

1. The payments made by F.H.L. to Boehmer were on account of an antecedent debt to an insider made within one year of the date of F.H.L.'s petition.

2. The transfers to Boehmer pursuant to the stock redemption agreement enabled him to receive more than he would receive as a creditor in this Chapter 7 proceeding if the transfers had not been made and Boehmer received payment of his claim as provided under the Bankruptcy Code.

3. Boehmer had reasonable cause to believe that F.H.L. was insolvent at the time of said transfer.

By Count V of the Complaint, the Trustee requests judgment against Boehmer voiding the alleged preferential payments and entering judgment in favor of F.H.L. in the amount of $7,696.23.

An Answer to the Trustee's Complaint was filed by Boehmer on April 23, 1986, seeking dismissal of the instant complaint. A trial was held on January 15, 1987 and continued further on February 13, 1987. At trial, the parties stipulated to the following:

1. Boehmer owned fifty (50%) percent of the shares of the debtor corporation and was an officer and employee of the debtor until February 1984. (See Transcript of

January 15, 1987 at p. 4) (hereinafter "Tr. I at ____").

2. Boehmer was an "insider" as defined by 11 U.S.C. § 101(25) until February 7, 1984. (Tr. I at 4).

3. In September 1983 the debtor was indebted to Boehmer in the approximate sum of $28,278.00. (Tr. I at 4).

4. Eleven (11) payments of $400.00, totalling $4,400.00, were made by the debtor to Boehmer between September 23, 1983 and December 16, 1983, on account of an antecedent indebtedness. (Tr. I at 4–5). (P–1).

5. On or about February 7, 1984 FHL entered into a written agreement with Boehmer establishing the amount of the indebtedness at $23,878.00. (Tr. I at 5). (P–2).

6. The debtor made twenty-one (21) payments of $76.53 to Boehmer,[3] totalling $1,607.13, dated from February 24, 1984 to July 13, 1984, to satisfy the agreed upon indebtedness. Of these twenty-one (21) checks, eight checks are dated between February 24, 1984 and April 13, 1984, (P–3), representing payments totalling $612.24. Thirteen (13) checks are dated between April 20, 1984 and July 13, 1984, representing payments totalling $994.89. However, the sole issue not stipulated to with regard to these twenty-one payments, evidenced by twenty-one (21) checks issued by the debtor and payable to Boehmer, is whether the check dated April 20, 1984 is within the ninety (90) day preference period alleged in Count II of the Trustee's Complaint. (Tr. I at 7–8). (P–3), (P–4).

7. All twenty-one (21) payments were made within one year of the date of the filing of the Chapter 7 petition and were made on account of an antecedent debt of the debtor. (Tr. I at 8).

8. On or about February 7, 1984 FHL entered into a written stock redemption agreement with Boehmer to purchase from Boehmer 33⅓ shares of stock of the debtor corporation representing fifty (50) percent of all the issued and outstanding common stock of the debtor for the sum of $72,722.00. Pursuant to this agreement, an initial installment of $3,000.00 was made by the debtor to Boehmer on February 16, 1984 leaving a balance due of $69,772.00. Between February 24, 1984 and July 13, 1984, the debtor made twenty-one (21) additional installment payments of $223.63 to Boehmer pursuant to the stock redemption agreement, totalling $4,696.23. Total payments made by the debtor to Boehmer under the stock redemption agreement amounted to $7,696.23. (Tr. I at 10–12). (P–6, P–5).

At trial, the Trustee provided the following checks written on checking account No. 704–733–5 held by the debtor at Fidelity Bank & Trust Company of New Jersey and made payable to Fred E. Boehmer.

Eleven checks, each with the notation "Repayment of loan from FHL Corp." marked Exhibit P–1:

| Date | Check No. | Amount |
|---|---|---|
| 9/23/83 | 9392 | $ 400.00 |
| 9/30/83 | 9430 | 400.00 |
| 10/7/83 | 9477 | 400.00 |
| 10/14/83 | 9506 | 400.00 |
| 10/21/83 | 9537 | 400.00 |
| 10/28/83 | 9590 | 400.00 |
| 11/4/83 | 9628 | 400.00 |
| 11/11/83 | 9668 | 400.00 |
| 11/18/83 | 9698 | 400.00 |
| 11/25/83 | 9728 | 400.00 |
| 12/16/83 | 9821 | 400.00 |
| | TOTAL | $4,400.00 |

One check with the notation "initial payment for purchase of FHL Inc. stock as per paragraph 2 of agreement of 2/7/84" marked Exhibit P–5:

| Date | Check No. | Amount |
|---|---|---|
| 2/16/84 | 10070 | $3,000.00 |

Eight checks, in the sum of $300.16 each with the notation "Settlement payments from F.H.L. Corp." and a breakdown of the payments into two portions, $76.53 and $223.63 allocated to separate obligations, marked Exhibit P–3:

| Date | Check No. | Amount | Allocation | |
|---|---|---|---|---|
| 2/24/84 | 10103 | $ 300.16 | $ 223.63 | $ 76.53 |
| 3/2/84 | 10143 | 300.16 | 223.63 | 76.53 |
| 3/9/84 | 10182 | 300.16 | 223.63 | 76.53 |
| 3/16/84 | 10214 | 300.16 | 223.63 | 76.53 |

---

**3.** All twenty-one (21) checks are in the amount of $300.16 of which $76.53 was allocated for payment of FHL's debt to Boehmer. (Tr. I at 7). (P–3), (P–4).

| Date | Check No. | Amount | Allocation | |
|---|---|---|---|---|
| 3/30/84 | 10270 | $300.16 | $223.63 | $76.53 |
| 3/23/84 | 10239 | 300.16 | 223.63 | 76.53 |
| 4/6/84 | 10297 | 300.16 | 223.63 | 76.53 |
| 4/13/84 | 10333 | 300.16 | 223.63 | 76.53 |
| | TOTAL | $2,401.28 | $1,789.04 | $612.24 |

Thirteen checks, each with the notation "Settlement payments from F.H.L. Corp." and a breakdown of the payments into two portions, $76.53 and $223.63, allocated to separate obligations, marked Exhibit P–4:

One of these checks is as follows:

| Date | Check No. | Amount | Allocation | |
|---|---|---|---|---|
| 4/20/84 | 10359 | $ 300.16 | $ 223.63 | $ 76.53 |

Twelve of these checks are as follows:

| Date | Check No. | Amount | Allocation | |
|---|---|---|---|---|
| 4/27/84 | 10382 | $ 300.16 | $ 223.63 | $ 76.53 |
| 5/4/84 | 10409 | 300.16 | 223.63 | 76.53 |
| 5/11/84 | 10429 | 300.16 | 223.63 | 76.53 |
| 5/18/84 | 10459 | 300.16 | 223.63 | 76.53 |
| 5/25/84 | 10479 | 300.16 | 223.63 | 76.53 |
| 6/1/84 | 10499 | 300.16 | 223.63 | 76.53 |
| 6/8/84 | 10523 | 300.16 | 223.63 | 76.53 |
| 6/15/84 | 10545 | 300.16 | 223.63 | 76.53 |
| 6/22/84 | 10548 | 300.16 | 223.63 | 76.53 |
| 6/29/84 | 10582 | 300.16 | 223.63 | 76.53 |
| 7/6/84 | 10597 | 300.16 | 223.63 | 76.53 |
| 7/13/84 | 10611 | 300.16 | 223.63 | 76.53 |
| | TOTAL | $3,601.92 | $2,683.56 | $918.36 |

Section 547(b) of the Code empowers the trustee to avoid certain "preferential" transfers of the debtor's property made before the debtor filed for bankruptcy relief. The provision was enacted to promote the Bankruptcy Code's policy of preserving a financially distressed debtor's estate so that the debtor's assets may be fairly distributed among all creditors, not merely those who are favored. *In re F & S Central Manufacturing Corp.*, 53 B.R. 842, 846 (Bankr.E.D.N.Y.1985) (citing authorities).

Section 547(b) was amended by PL 98–353, The Bankruptcy Amendments and Federal Judgeship Act of 1984 ("BAFJA") effective as to cases filed 90 days after the date of enactment, which was July 10, 1984. Since the voluntary petition in the present case was filed on July 23, 1984, it is governed by the previous statute enacted pursuant to the Bankruptcy Reform Act of 1978 which provided:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer—

(i) was an insider; and

(ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b) (amended).

Thus, for the purpose of a "laundry list" of elements to avoid a pre-bankruptcy transfer, the trustee must prove: (1) that the transfer was a transfer of the debtor's interest in property; (2) to or for the benefit of a creditor; (3) on account of the debtor's antecedent debt; (4) made during the 90 day period preceding the debtor's filing for bankruptcy relief, or if the creditor is an "insider," made within the year preceding the filing at a time when the creditor had reasonable cause to believe that the debtor was insolvent; (5) made at a time when the debtor was insolvent; and (6) enabled the creditor to receive more than he would receive in a Chapter 7 distribution. *In re F & S Central Manufacturing Corp., supra,* 53 B.R. at 846.

The following is a summary of the alleged preferential transfers for the purpose of clarifying the timing of the transfers in the context of the insider provision and 90–day provision of § 547(b). One year before the date of the filing of the petition falls on July 23, 1983. From that

date until February 7, 1984, which is the date it was agreed that Boehmer ceased to be an insider, eleven checks[4] each in the amount of $400.00 were drawn by the debtor and made payable to Boehmer. From February 7, 1984 until April 23, 1984, which marks the beginning of the ninety-day preference period, ten checks were drawn by the debtor and made payable to Boehmer. The checks included: one check in the amount of $3,000.00 drawn on February 16, 1984 with the notation "initial payment for purchase of FHL Inc. Stock as per paragraph 2 of agreement of 2/7/84." (*See* Exhibit P–5); and nine checks each in the amount of $300.16 drawn between February 24, 1984 and April 20, 1984.[5] Between April 23, 1984, the beginning of the 90–day period, until July 23, 1984, the date of the filing of the debtor's petition, twelve checks each in the amount of $300.16 were drawn by the debtor and made payable to Boehmer.[6]

The stipulations entered into by the parties have disposed of some of the elements which must be proved. The stipulations have resolved the following: the transfers by the debtor were transfers of its interest in property; the transfers were to or for the benefit of a creditor—Boehmer; the transfers were on account of an antecedent debt owed by the debtor to Boehmer; of the twenty-one (21) payments made to Boehmer regarding the "settlement payments from FHL, Inc.", twelve checks drawn between April 23, 1984 and July 23, 1984 were made within the 90 day preference period; and, Boehmer was an "insider" as defined by the Code until February 7, 1984.

Additionally, the stipulations have resolved the entire issue as to whether certain transfers are preferential. Because Boehmer was no longer an insider from February 7, 1984 and thereafter, the transfers made by the debtor between February 7, 1984 and April 23, 1984, the beginning of the ninety-day period, are not preferences. Section 547(b) requires that in order to be preferences, transfers made between 90 days and one year before the date of the filing of the petition be made to an insider. It has been stipulated by the parties that Boehmer ceased to be an insider of FHL on February 7, 1984. Thus, the check written by the debtor on February 16, 1984 in the amount of $3,000.00 is not a preference; the eight checks drawn by the debtor between February 24, 1984 and April 13, 1984, marked Exhibit P–3, each in the amount of $300.16 are also not preferences. One remaining check drawn on April 20, 1984 remains at issue because it was written prior to the ninety-day period but not honored by the bank until April 27, 1984, within the ninety-day period.

Therefore, under the counts in the Trustee's complaint alleging preferential transfers, basically four issues remain for this court's determination.[7]

1. Under Counts I, II and V, whether the debtor was in fact insolvent on the dates of the transfers.

2. Under Counts I and V, whether Boehmer, as an insider, had reasonable cause to believe that the debtor was insolvent.

3. Under Counts I, II and V whether the transfers made by the debtor to Boehmer enabled Boehmer to receive more than he would have as a creditor in the Chapter 7 proceeding if the transfers had not been made and Boehmer received payment of his claim as provided by the Bankruptcy Code.

---

4. The eleven checks were drawn between September 23, 1983 and December 16, 1983 and were made with the notation "Repayment of Loan from FHL Corp."

5. Each of the nine checks had the notation "Settlement payments from F.H.L. Corp." and a breakdown of the payments into two portions, $76.53 and $223.63, allocated to separate obligations.

6. Each of the twelve checks had the notation "Settlement payments from F.H.L. Corp." and a breakdown of the payments into two portions, $76.53 and $223.63, allocated to separate obligations.

7. The remaining Counts, Counts III and IV, alleging a fraudulent conveyance under both 11 U.S.C. § 548 and N.J.S.A. § 25:2–1 *et seq.* will be discussed after the preference counts have been determined.

4. Under Count II, whether the payment by the debtor to Boehmer by check dated April 20, 1984, but cashed on April 27, 1984 falls within the 90 day preference period.

Section 547(b)(3) requires that the debtor be insolvent at the time of the transfer. In response to the problems engendered by requiring proof of insolvency under the Act, Congress included Section 547(f) in the Bankruptcy Code,[8] which states:

> (f) For the purpose of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition.

11 U.S.C. § 547(f).

■ However, the presumption of insolvency applies *only* during the ninety days immediately preceding the date of the filing of the petition. Hence, because the Trustee, in Counts I and V, is challenging transfers to an insider that occurred more than ninety days before the filing of the petition, the presumption is of no apparent circumstance. *In re Camp Rockhill, Inc.,* 12 B.R. 829, 833 (Bankr.E.D.Pa.1981). Therefore, the Trustee must establish the debtor's insolvency on the dates the transfers outside the ninety-day period were made. *Id.*

■ Insolvency is defined by § 101(26) of the Code, which states:

(26) "insolvent" means—

(A) with reference to an entity other than a partnership, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—

(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

(ii) property that may be exempted from property of the estate under section 522 of this title; . . .

11 U.S.C. § 101(26)(A) (currently codified at 11 U.S.C. 101(31)(A)).[9] This section incorporates the "balance sheet" test of insolvency. In other words, a debtor is insolvent when the fair value of his liabilities exceeds the fair value of his assets. *In re Camp Rockhill, Inc., supra,* 12 B.R. at 833, *citing, National Buy-Rite, Inc.,* 7 B.R. 407, 410 (Bankr.N.D.Ga.1980).

At trial, the Trustee produced for testimony, Robert Boory ("Boory"), senior accountant with the accounting firm of Benen, Saidel & Company. Boory is the accountant who was in charge of compiling the debtor's books and records and preparing the debtor's financial statements and income tax returns since its incorporation in 1976. Through Boory's testimony, the Trustee introduced into evidence the debtor's 1983 financial statements and federal corporate tax returns for the years 1982 and 1983.

The debtor's 1982 U.S. Corporation Income Tax Return, Exhibit P–9, revealed that the debtor had a current loss for the 1982 calendar year of $19,092.00; a net operating loss carryforward from 1981 of $21,360.00 a total net operating loss of $40,452.00, and a positive stockholders' equity of approximately $25,000.00.

The debtor's 1983 U.S. Corporation Income Tax Return, Exhibit P–10, revealed

---

**8.** The legislative history regarding the difficulty of proving insolvency states:

The current preference section contains several impediments to the proper functioning of these two policies. First, the preference section requires the bankruptcy trustee to prove the debtor's insolvency at the time the preferential transfer was made. Given the state of most debtor's books and records, such a task is nearly impossible. Given the financial condition of nearly all debtors in the three months before bankruptcy, the task is also generally not worth the effort. Rarely is a debtor solvent during the three months before bankruptcy. Thus, the preference section requires the trustee to prove a fact that nearly always exists yet never can be proved with certainty. This factor leads to far fewer preference recoveries than otherwise would be the case. Because of the difficulty of proof, creditors are not deterred from the race of diligence, and the policy of equality is defeated. H.R.Rep. No. 95–595, 95th Cong., 2nd Sess. 178 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6138.

**9.** "Entity" is defined by § 101(14) to include a person. A "person" is defined by § 101(30) (currently § 101(35)) to include a corporation.

that the debtor had a current loss for the 1983 calendar year of $101,716.00; a net operating loss carryforward from 1982 of $40,452.00, a total net operating loss carryforward of $142,168.00, and a negative stockholders' equity of approximately $78,000.00.

The debtor's financial statements as of December 31, 1983, specifically the income statement, indicates a net loss by the debtor for the calendar year 1982 of $20,231.00. (*See* Exhibit P–8; Tr. I at p. 26). The income statement also indicates a net loss by the debtor for the calendar year 1983 of $102,801.00. (*See* Exhibit P–8; Tr. I at p. 26). The debtor's balance sheet as of December 31, 1983 indicates that the current assets of the debtor were $134,761.00, total assets were $149,773.00, current and total liabilities were $227,675.00, and stockholder's equity showed a deficit of $77,902.00. (*See* Exhibit P–8; Tr. I at pp. 28–30).

The Trustee also relied upon the petition and schedules filed by the debtor in these bankruptcy proceedings. Schedule A–3 indicates that the debtor had total liabilities as of the date of the petition in the amount of $239,438.95 of which $199,680.95 are scheduled as unsecured claims. Schedule B–2 indicates that the debtor's assets totalled $113,459.33.

Fred Boehmer, who had been a partner in the debtor's business, also testified at trial. Boehmer testified that when the debtor was incorporated in 1976 he, Boehmer, along with Henry Sachs and Leon Sachs, served as corporate officers and equal shareholders. The debtor's business was the retail sale of ladies' shoes. Approximately two years after the debtor was incorporated, Henry Sachs died and Boehmer and Leon Sachs remained as officers. Boehmer testified that at that time the debtor company purchased certain trade rights from Henry Sachs' widow to continue the use of the trade name "Mr. Henry's." Boehmer testified that the income tax returns and financial statements of the debtor did not reflect the true value of the debtor corporation, FHL. (*See* Transcript of February 13, 1987 at p. 49) (hereinafter "Tr. II at _____"). To support this conten-

tion, Boehmer stated that he and Lou Sacks ("Sacks"), the other partner in FHL, tried not to show a profit on their financial statements and income tax returns to avoid the payment of income taxes. Tr. II at 44–45. Boehmer also testified that the business had the practice of hiding cash and putting it in the corporation's safe deposit box but testified that he had no knowledge of any diverted or unreported cash receipts in 1982 or 1983. *See* Tr. II at 56–57. Boehmer also stated that he thought the value of the debtor was approximately $145,000.00 when he sold his stock interest in February 1984. Tr. II at 19–20. However, on cross-examination Boehmer testified that in the second half of 1983 the business was late on some bills and that he and Sacks had to infuse capital into the business to pay those bills. Tr. II at 63–64.

Boehmer and his counsel, rely upon the testimony tending to show that the debtor stashed money away in safety deposit boxes and that the income tax returns, which are sworn documents, and financial statements do not accurately reflect the true value of FHL. These assertions must be weighed against the Trustee's evidence— namely, the financial statements and income tax returns which clearly demonstrate that the debtor's liabilities exceed its assets for the relevant periods. The question of the debtor's insolvency is one of fact for this court to make. *See Braunstein v. Massachusetts Bank & Trust Co.,* 443 F.2d 1281, 1284 (1st Cir.1971). It is this court's opinion, based on the more credible evidence given by Boory and the financial documents of FHL, that the debtor was indeed insolvent during the period in which the transfers were made, that being from September 23, 1983, the date of the first deposited transfer, up until the date the bankruptcy petition was filed.

The debtor's year-end, December 31, 1983 financial statements showed total assets of $149,773.00, current liabilities of $227,675.00, and a negative stockholders' equity of $77,902.00. Fred Boehmer testified that during the last six months of 1983 the debtor corporation was having difficulty paying its bills and that the shareholders had to infuse capital into the corporation by

way of officers' loans. The evidence taken together satisfied the court that the debtor was insolvent from at least September 23, 1983 when the first disputed transfer was made, until the date the bankruptcy proceeding was commenced. The bankruptcy schedules filed herein on July 23, 1984, show as of the commencement of this case assets of $113,459.33 and liabilities of at least $239,438.95. As previously indicated, the burden of proof remains on the Trustee to establish each element of a preference, including insolvency. However, the intial burden of going forward with evidence as to transfers occurring during the ninety days preceding the date of the filing of the petition, as alleged by the Trustee in Count II of his complaint, is altered by § 547(f). Section 547(f) requires the party against whom the presumption exists to come forward with some evidence to rebut the presumption. *In re Bellanca Aircraft Corporation*, 56 B.R. 339, 384 (Bankr.D.Minn. 1985), *aff'd. in part remanded in part*, 850 F.2d 1275 (8th Cir.1988). Therefore, the Trustee carries the ultimate burden of proving insolvency whether the transfers occurred inside or outside of the ninety day period.

The presumption of insolvency during the ninety days preceding the filing contained in § 547(f) is not rebutted by Boehmer's testimony regarding his opinion as to the value of the company and his attempts to discredit the financial statements and income tax returns of the debtor. The best evidence and most credible evidence is that of Boory and the financial documents of FHL which indicate that the debtor was insolvent during both the ninety days and one year preceding the filing of its bankruptcy petition at the times of the disputed transfers. Thus, for the purposes of Counts I, II and V, the debtor is deemed to have been insolvent on the dates of the transfers to Boehmer.

As set forth above, the bankruptcy schedules filed herein on July 23, 1984 show that as of the commencement of this case the debtor scheduled assets totalling $113,459.33 and liabilities of at least $239,438.95, of which $199,680.95 were scheduled as unsecured claims. Accordingly, the court is satisfied that for purposes of Counts I, II and V the transfers made by the debtor to Boehmer during both the ninety day and one year period preceding the filing of debtor's bankruptcy petition, enabled Boehmer to receive more than he would in a Chapter 7 distribution if the transfers had not been made.

Regarding Counts I and V of the Trustee's Complaint, which allege transfers to an insider made within one year of the filing of FHL's petition, the Trustee must also demonstrate that Boehmer had reasonable cause to believe the debtor was insolvent during that period. 11 U.S.C. § 547(b)(4)(B)(ii) (repealed). The determination of the existence of reasonable cause to believe that the debtor was insolvent at the time of the transfers must be done on a case by case basis. *In re Castle Tire Center, Inc.*, 56 B.R. 180, 182 (Bankr.W.D.Pa. 1986), *citing, In re Gruber Bottling Works, Inc.*, 16 B.R. 348, 352 (Bankr.E.D. Pa.1982). In determining whether a creditor had reasonable cause, several general propositions emerge from the cases and commentaries but each case, ultimately, must be decided on its own facts. *In re Camp Rockhill, Inc., supra*, 12 B.R. at 834 (citing authorities).

The Code requires neither actual knowledge of nor belief in the debtor's insolvency. All that is necessary is reasonable cause to believe the debtor is insolvent. However, it is important to note that mere suspicion of insolvency is not enough to charge the creditor with reasonable cause to believe the debtor is insolvent. (citations omitted). Yet, it is adequate if a creditor has such knowledge or notice of such facts and circumstances as would incite a person of reasonable prudence under similar circumstances to make inquiry. If the inquiry would lead to the development of facts essential to the knowledge of the situation, he will be charged with knowledge thereof. (citations omitted).

*In re Camp Rockhill, Inc., supra*, 12 B.R. at 834.

In the instant case, Boehmer was aware of the financial statements and income tax

returns of FHL. These documents showed a negative equity position and an ongoing negative net operating loss. This financial situation caused FHL to eventually become late in paying trade creditors as evidenced by Boehmer's own testimony. Tr. II at 63–64. In fact, both Boehmer and Sacks were required to infuse capital into the business to pay these debts. Tr. II at 64. Additionally, Boehmer testified that he loaned almost $24,000.00 to FHL during the time he was involved with the business. The following is a summary of those loans drawn by Boehmer from his personal certificate of deposit account with Fidelity Bank and deposited into FHL, Inc.'s bank account:

| Date | Check No. | Amount |
|------|-----------|--------|
| 2/16/82 | 147613 | $ 1,148.00 |
| 8/5/82 | 154693 | 10,000.00 |
| 3/3/83 | 164994 | 1,000.00 |
| 8/19/83 | 175467 | 10,000.00 |
| | TOTAL | $22,148.00 |

Boehmer also testified that he loaned an additional $1,000.00 to FHL but he could not produce the cancelled check. Tr. II at 9. Thus, Boehmer loaned FHL a total of at least $23,148.00 for working capital purposes.

█ It is evident to this court that at one time the debtor was a successful ongoing business. However, at some point in time it began to slide into financial problems, the cause of which is unknown. This slide began at the latest in 1982, because FHL's income tax returns and financial statements for that year indicate a negative net operating loss. This court is of the opinion that Boehmer had "notice of facts that would lead a prudent businessman to conclude the debtor is insolvent." *Matter of Castle Tire Center, Inc., supra,* 56 B.R. at 182, *citing, In re Frigitemp Corp.,* 34 B.R. 1000, 1004 (S.D.N.Y.1983), *aff'd.,* 753 F.2d 230 (2d Cir.1985). Thus, for purposes of Counts I and V of the Trustee's Complaint, Boehmer is deemed to have had reasonable cause to believe the debtor was insolvent.

Having determined that the debtor was indeed insolvent during the one year period preceding its filing and that Boehmer had reasonable cause to believe the debtor was insolvent, the transfers made by the debtor to Boehmer during the time in which Boehmer was an insider, from July 23, 1983 to February 7, 1984, are preferential transfers. These transfers include the eleven checks drawn by the debtor between September 23, 1983 and December 16, 1983, each in the amount of $400.00 and totalling $4,400.00. The twelve checks drawn between April 23, 1984 and July 23, 1984, in the amount of $300.16 each or $3,601.92,[10] are similarly preferential transfers for total preferential payments of $8,001.92.

The sole issue remaining with regard to the preference counts of the Trustee's complaint is whether the check drawn by the debtor on April 20, 1984, outside the ninety preference period, but honored by the bank on April 27, 1984, within the ninety day preference period, is indeed a preferential transfer. This issue is critical because if the transfer is deemed to have occurred on the date of delivery it falls within the period that Boehmer was no longer an insider and therefore it cannot be a preference. On the other hand, if the transfer is deemed to have occurred when the bank honored the check it is a preferential transfer made within the ninety day period. Unfortunately, there is a split of authority on the issue.

Section 547(b)(4) states that a transfer is avoidable if made "on or within 90 days before the date of the filing of the petition." 11 U.S.C. § 547(b)(4). Three circuit courts of appeals have addressed the issue of when a transfer by check occurred for purposes of the voidability period for preferences, either the four month period of § 60 of the Act or the 90 day period of § 547 of the Code. In *Nicholson v. First Investment Co.,* 705 F.2d 410 (11th Cir. 1983) (Act case), the Eleventh Circuit Court of Appeals held that the date of transfer is the date when the check is honored by the paying bank, stating:

**10.** Of that amount $2,683.56 ($223.16 × 12) represents payments made by debtor to Boehmer pursuant to the stock redemption agreement

and the balance of $918.36 ($76.53 × 12) on account of other antecedent debts.

The Bankruptcy Act provides that for the purpose of determining whether a preference has taken place,

> a transfer of property ... shall be deemed to have been made or suffered at the time when it became so far perfected that no subsequent lien upon such property obtainable by legal or equitable proceedings on a simple contract could become superior to the rights of the transferee.

11 U.S.C. § 96(a)(2). In the case of a check, the transfer is not completed at the time of delivery. Creditors could prevent collection of the funds through such means as garnishment of the bank account. Although in the non-bankruptcy context, a check honored in the regular course of business relates back to the date of delivery, see *Duke v. Sun Oil*, 320 F.2d 853, 861 (5th Cir.1963), under the "so far perfected" language of the Bankruptcy Act, the date of transfer is the date when the check is honored by the paying bank. *Accord, Fitzpatrick v. Philco Finance Corp.*, 491 F.2d 1288, 1293 (7th Cir.1974). *Contra, Shamrock Golf Company v. Richcraft, Inc.*, 680 F.2d 645 (9th Cir.1982).

*Nicholson v. First Investment Co., supra*, 705 F.2d at 413. In *Fitzpatrick v. Philco Finance Corp.*, 491 F.2d 1288 (7th Cir. 1974) (Act case), the Seventh Circuit Court of Appeal reached the same conclusion as the Eleventh Circuit, stating:

> The better view seems to be that payment of the check by the drawee, rather than the sending or receipt of the check, constitutes the transfer under the Bankruptcy Act. 3 Collier on Bankruptcy 820–23 (14th ed. 1971).

*Fitzpatrick v. Philco Finance Corp., supra*, 491 F.2d at 1293.

11. 11 U.S.C. § 547(c)(1) and (2) provides:

(c) The trustee may not avoid under this section a transfer—
(1) to the extent that such transfer was—
(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
(B) in fact a substantially contemporaneous exchange;
(2) to the extent that such transfer was—

In *Shamrock Golf Co. v. Richcraft, Inc.*, 680 F.2d 645 (9th Cir.1982) (Act case), the Ninth Circuit Court of Appeals held that checks delivered to creditors outside the four-month voidability period of the Act were not voidable as preferences despite the fact that they were honored by the bank within the four-month voidability period. The court held that payment by check constitutes a cash sale, and is therefore a contemporaneous transfer, so long as the check was presented within a reasonable time and not dishonored. *Shamrock Golf Co. v. Richcraft, Inc., supra*, 680 F.2d at 646, *citing, Engstrom v. Wiley*, 191 F.2d 684, 686 (9th Cir.1951). Additionally, the court relied on the rationale behind the contemporaneous transfer exception to the preference provisions contained in § 547(c).[11] The court cited the Notes of the Senate Judiciary Committee which stated:

> Contrary to the language contained in the House Report, payment of a check is equivalent to a cash payment, unless the check is dishonored. Payment is considered to be made when the check is dishonored for purposes of Section 547(c)(1) and (2). ·

*Shamrock Golf Co. v. Richcraft, Inc., supra*, 680 F.2d at 646.

The Ninth Circuit Court of Appeals addressed the identical issue in *In re Kenitra, Inc.*, 797 F.2d 790 (9th Cir.1986) (Code case), *cert. denied*, 479 U.S. 1054, 107 S.Ct. 928, 93 L.Ed.2d 980 (1987). In *Kenitra* the court, relying on *Shamrock Golf*, held that

> [a] debtor's payment by check on an existing debt, presented to the bank within a reasonable time and honored by the bank, is deemed made at the time the debtor gave the check to the creditor.

*In re Kenitra, supra*, 797 F.2d at 791.

Some recent bankruptcy court decisions addressing the issue have utilized and ex-

(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;
(B) made not later than 45 days after such debt was incurred;
(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
(D) made according to ordinary business terms.
11 U.S.C. § 547(a)(1), (2).

panded upon the logic of both the *Nicholson* case and the *Shamrock Golf* case. In *In re Bob Grissett Golf Shoppes, Inc.*, 34 B.R. 320 (Bankr.E.D.Va.1983), the court held that the debtor's payment dates from the date the drawee bank honored the debtor's draft stating:

> A transfer of property, other than real property, is perfected when a creditor on a simple contract cannot acquire a judicial lien superior to the interest of the payee. 11 U.S.C. § 547(e)(1)(B). In other words, there has been no transfer of property when a creditor can attach the debtor's funds in the possession of the drawee bank. Upon the drawee bank's honoring of a draft, funds are no longer in the account and attachment is not possible. A transfer of property by way of a check is made only when the debtor's bank ultimately honors the check. *In re Skinner Lumber Co.*, 27 B.R. 669, 670–71 (Bkrtcy.D.S.C.1982); *In re Super Market Distrib. Corp.*, 25 B.R. 63, 64 (Bkrtcy.D.Mass.1982); *In re Sportsco, Inc.*, 12 B.R. 34, 36 (Bkrtcy.D.Ariz.1981). *See* U.C.C. § 3–409 (1980) (check in itself does not vest in payee any title to or interest in funds held by drawee bank).

*In re Bob Grissett Golf Shoppes, Inc.*, *supra*, 34 B.R. at 322.

In *Sider Ventures & Services Corp.*, 47 B.R. 406 (S.D.N.Y.1985), the district court affirmed the bankruptcy court's use of § 547(e)(2)(A) to a § 547(b) situation. Section 547(e)(2)(A) provides that for purposes of that section a transfer is made when it "takes effect between the transferor and the transferee if such transfer is perfected at, or within 10 days after, such time." 11 U.S.C. § 547(e)(2)(A). The district court held that the bankruptcy judge's conclusion was that:

> although a check transfer is not perfected—that is, the transfer is not entirely complete—until payment is made by the bank, the transfer "takes effect" immediately upon delivery.
>
> While it is true that the obligation is not discharged until the check is honored, delivery of the check suspends the right to sue on the obligation and sets in motion the inevitably time-consuming

process of transferring the drawer's property, in the form of bank funds, to the payee. Delivery of the check thus sets in motion the process of debt satisfaction, and for that reason Judge [Prudence] Abram concluded that the transfer "takes effect" on the day of delivery. [*In re Sider Ventures & Services Corp.*,] 33 B.R. 710–711 [Bank.S.D.N.Y.1983]. *Accord, In re Blanton Smith Corp.*, 37 B.R. 303, 308 (Bankr.M.D.Tenn.1984) (expressly); *In re Wadsworth Building Components, Inc.*, 711 F.2d 122, 123 (9th Cir.1983) (implicitly). This holding harmonizes with daily experience in the use of checks. One considers a debt "paid," even if it is not legally satisfied, on the day on which a check in payment is delivered to one's creditor. It is only the unavoidably time-consuming nature of check delivery and presentment which prevents discharge of the debt from occurring immediately upon delivery of the check. Thus it is appropriate to hold that the transfer takes effect immediately upon delivery.

*In re Sider Ventures & Services Corp.*, *supra*, 47 B.R. at 409.

■ This court agrees with the rationale of the *Shamrock Golf* line of cases and finds that the subject "transfer" for purposes of Section 547 took effect immediately upon delivery to Boehmer on April 20, 1984, outside the ninety-day preference period. Accordingly, this transfer cannot be avoided by the Trustee as a preference under Section 547.

Regarding Counts III and IV of the Trustee's Complaint, § 548 governs fraudulent transfers and obligations and states, in pertinent part:

> (a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> > (1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to

which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a). The Trustee's Complaint does not specifically allege the subsection of 548(a) under which he is proceeding. However, from the testimony and evidence presented it is obvious that the Trustee is proceeding under § 548(a)(2)(A) and (B)(i). Thus, the Trustee must prove that less than a reasonably equivalent value was received by the debtor from Boehmer in the stock redemption and that the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer. *See In re Corporate Jet Aviation, Inc.*, 45 B.R. 629, 633 (Bankr.N.D.Ga.1985).

The debtor and Boehmer entered into a Stock Redemption Agreement on February 7, 1984. (Exhibit P–6). Under the agreement, Boehmer agreed to sell his 50% of all the outstanding stock of FHL back to the corporation. FHL agreed to pay $72,-722.00 to Boehmer, which was to be paid by an initial payment of $3,000.00 and a promissory note in the sum of $69,722.00 covering the balance of the purchase price. The promissory note provided that the debtor pay Boehmer weekly installments of $223.63 as consideration for the Stock Redemption Agreement. (Exhibit P–4).

This court, in the context of the preference counts of the Trustee's Complaint, has already found that the debtor was insolvent during the one year period prior to filing its bankruptcy petition from at least September 23, 1983. The Stock Redemption Agreement was entered into by the debtor and Boehmer on February 7, 1984 within that one year period. The payments made by the debtor pursuant to said agreement included one check dated February 6, 1984 in the amount of $3,000.00 with the notation "initial payment for purchase of FHL Inc. stock as per paragraph of agreement of 2/7/84." (Exhibit P–5). Additional payments included twenty-one checks dated between February 24, 1984 and July 13, 1984 each in the amount of $300.16, of which $223.63 was allocated to payments under a promissory note entered into by the debtor and Boehmer as consideration for the stock redemption, and $76.53 was allocated as an unrelated loan due by the debtor corporation to Boehmer. The total payment allocated to the stock redemption agreement as represented by the twenty-one checks is $4,696.23.

Thus, the Trustee must only establish that the debtor received less than reasonably equivalent value for the redemption of its stock from Boehmer. To carry this burden, the Trustee presented testimony from Boory regarding the effect of the stock redemption agreement on the financial books of the debtor. The questioning of Boory by the Trustee proceeded as follows:

Q: There's reference, and you've heard reference in court in the admissions to a stock redemption; is that right?

A: Yeah.

Q: Did the stock redemption occur before or after December 31st, 1983?

A: After.

Q: Is the effect of the stock redemption reflected in the balance sheet which you've just testified to? [Financial Statement as of December 31, 1983, P–8]

A: No. It couldn't have been.

Q: So, then that reflects the state of the company prior to the stock redemption?

A: That's correct.

Q: Mr. Boory, let me ask you this. How would the redemption of stock be treated on the balance sheet of the company?

A: How would it be.

Q: Yes.

A: Well, if the company buys, redeems the stock, pays for the stock, then it's classified as treasury stock, which is a reduction in the stockholders' equity.

Q: When you say a reduction, would that have the impact of a negative or a positive?

A: A negative.

Q: What impact would P–7, which was admitted into evidence as a promissory note in the amount of $69,722, what impact would that have on the balance sheet of the debtor? Let me focus my question a little more fully.

A: Go ahead. I'm not clear on that.

Q: In the transaction that occurred here, the debtor corporation agreed to buy back the stock of Mr. Boehmer for $72,722, and the consummation of that gave Mr. Boehmer $3,000 by way of check and a promissory note for 69,722.

How would those two transactions be reflected on the balance sheet?

A: Well, it would be a liability of the corporation and an increase of treasury stock, which would be a bigger deficit to the stockholder's equity. (Tr. I at 35–37).

In *In re Roco Coruoration*, 701 F.2d 978 (1st Cir.1983), the First Circuit Court of Appeals affirmed the conclusion reached by both the bankruptcy court and the bankruptcy appellate panel that a $300,000.00 note and security interest transferred by the debtor corporation to its sole shareholder within one year of bankruptcy as consideration for the redemption of all the corporation's outstanding stock was a fraudulent conveyance under § 548(a)(1) and (a)(2). The circuit court agreed with the bankruptcy court's finding that the debtor received less than reasonably equivalent value for note and security interest, and in fact, received nothing at all rendering the transfer fraudulent under section 548(a)(2). *In re*

*Roco Corporation, supra*, 701 F.2d at 982. The court stated:

> Under generally accepted accounting principles this treasury stock would be reported on the balance sheet of Roco [the debtor] as a reduction of stockholders' equity, not as an asset. *See generally* R. Anthony & J. Reese, *Accounting Principles* 215 (4th ed. 1979) ("Treasury sotck is clearly not an 'economic resource' of an entity."). As the appellate panel noted, treasury stock is a form of shareholder distribution from which the corporation receives no assets. When a corporation purchases treasury stock it reduces its capitalization.

*In re Roco Corporation, supra*, 701 F.2d at 982. *Accord, In re Corporate Jet Aviation, Inc., supra*, 45 B.R. at 634 (citing authorities).

The creditor/shareholder in *Roco* argued that under this accounting theory, no stock redemption could survive a § 548(a)(2)(A) attack. The First Circuit Court of Appeals, in addressing this issue, refused to adopt such a blanket rule, stating:

> It is possible, for example, that a publicly traded corporation with many shares outstanding could redeem a fraction of these shares, perhaps to fund an executive benefits plan or to use in converting convertible bonds or preferred stocks, and receive value as defined in the Bankruptcy Code that would be reasonably equivalent to what it transferred.

*In re Roco Corporation, supra*, 701 F.2d at 982.

■ The instant case is very similar to the situation in *Roco*. Boehmer, as a 50% shareholder of the debtor, was to receive $72,722.00 in exchange for his 33⅓ shares, or 50% stock interest in FHL. The testimony of Boorey follows the holding of the First Circuit Court of Appeals in *Roco*. Boory, the debtor's accountant, testified that when FHL bought the stock back from Boehmer it would be treated as treasury stock, which is a reduction in stockholder's equity. Tr. I at 36. Additionally, the promissory note would create a further increase in FHL's liabilities. Tr. I at 37. Thus, it is this court's opinion, as reflected in the *Roco* decision, that the debtor re-

ceived less than reasonably equivalent value when it entered into the stock redemption agreement with Boehmer, and as found earlier in this opinion, the debtor corporation at the time of the transfer, February 7, 1984, was insolvent. Accordingly, the payments made by FHL pursuant to the stock redemption agreement are deemed fraudulent conveyances under 11 U.S.C. § 548(a)(2)(A) and (B)(i). These payments include a $3,000.00 check dated February 16, 1984 and the $223.63 allocated to the stock redemption in each of the twenty-one checks made by FHL to Boehmer between February 24, 1984 and July 13, 1984, totalling $4,696.23, for a total sum of $7,696.23.[12]

In summary, preferential payments in the amount of $8,001.92 were made to Boehmer by the debtor. Payments made by the debtor to Boehmer in the total sum of $7,696.23 also constitute fraudulent conveyances. These two figures total $15,698.15. Included in the sum of $7,696.23, however, are twelve payments in the sum of $223.16 or $2,683.56, which were previously held to also be preferential payments. Therefore, judgment shall issue against Boehmer and in favor of the debtor estate in the sum of $13,014.59. However, eight payments made between February 24, 1984 and April 13, 1984 in the amount of $300.16, of which $76.53 was allocated to a loan repayment are neither preferences nor fraudulent conveyances to the extent of the $76.53 allocation. This is the case because the payments were not on account of the stock redemption and were made outside the 90–day preference period and at a time when Boehmer was no longer an insider. The same holds true for the payment dated April 20, 1984 to the extent of the $76.53 allocation. Thus, a total of $688.77 in payments are neither preferences nor fraudulent conveyances.

An appropriate order in accordance with this opinion shall be submitted.

---

**12.** Having avoided the payments made under the stock redemption agreement under § 548, this court need not address whether the payments constituted a fraudulent conveyance under N.J.S.A. 25:2–1 *et seq.*